

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

_____

No. 06-07-00134-CV
_____

JACK BESTEMAN AND PAM BESTEMAN, Appellants

V.

JERRY PITCOCK AND JOANNE PITCOCK, Appellees

On Appeal from the 62nd Judicial District Court
Lamar County, Texas
Trial Court No. 75422

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

OPINION

About two months after Jack Besteman and his wife, Pam, acquired a called 235–acre tract of land in Lamar County as part of a like-kind exchange for property they had owned in another state, the Bestemans were approached by Jerry Pitcock and his wife, Joanne, who wanted to buy it. Jack Besteman refused to sell it to the Pitcocks in an outright sale, indicating that he would only agree to part with it if it could be achieved through a similar like-kind exchange of the manner he had just experienced, thus saving substantially on taxes which would otherwise be incurred. As a vehicle to facilitate this, Besteman insisted that the Pitcocks enter into a lease of the property for two years with an option to purchase at the termination of the lease agreement. Besteman explained this delay by indicating that he wanted an opportunity to locate available apt real estate which could be used to effect such an exchange.

Besteman drafted a lease/option agreement by which the Pitcocks would pay the Bestemans $11,675.00 per year for two years and, at the expiration of the lease term, could exercise the option to purchase the property at $950.00 per acre (i.e., $223,250.00). The general form of the lease/option agreement was drawn heavily from one which the Bestemans had used in the past in another transaction. It contained clauses that required maintenance of the pastures and improvements in accord with good husbandry of the land and dictated that any addition or removal of improvements on the land could only be done with the approval of the Bestemans. A condition precedent in the contract to the Pitcocks' right to purchase was stated as follows: "90 days before the 24 month lease

2

period expires, Lessee will notify Lessor of Lessee's intent to purchase said property." The twenty-four-month lease period was set to expire on September 20, 2006. The lease agreement also specified that:

> Any notice required, or permitted to be delivered hereunder must be in writing, and all notices and payments of rent will be deemed received on the date they are deposited in the United States mail, certified mail or registered mail, postage prepaid, return receipt requested, addressed to Lessor or Lessee, as the case may be, at the address shown above, or at such other place as the Lessor or Lessee may from time to time designate by written notice as provided in this paragraph. Notices delivered otherwise will be effective upon receipt.

It is uncontroverted that no written notice of an intention to exercise the option to purchase was given by the Pitcocks to the Bestemans at least ninety days before the expiration of the lease agreement term.

The Pitcocks went into possession of the tract of land under the lease agreement and made timely payments of the lease installments. However, they failed to provide any written notice of their intention to exercise the option to purchase until some forty-nine days after the time specified in the contract. When the Pitcocks did send written notice by certified mail, it was not retrieved by the Bestemans and the notice was returned, undelivered.

Almost immediately after the notice was returned to them, the Pitcocks filed suit for specific performance, declaratory judgment, and breach of contract. In their petition, the Pitcocks alleged that they had provided unequivocal notice of their intention to exercise the option to purchase well before the required time and that they had, in reliance upon the option to purchase, invested

3

substantial sums in improving the property. The Bestemans responded with a request for an award of reasonable rentals from the time of the termination of the two-year lease until the time of recovery of the property from the Pitcocks. Both parties requested attorneys' fees pursuant to Sections 37.009 and 38.001 of the Texas Civil Practice and Remedies Code.

The Pitcocks maintain that although the contract states that all notices required under the agreement be in writing and delivered by certified mail, the paragraph concerning notices ends with the statement that "Notices delivered otherwise will be effective upon receipt." The Pitcocks insist that since the contract permits notices to be delivered "otherwise," that means that the notice could be delivered orally rather than in writing; in other words, the Pitcocks say that they effected notice by oral communication and that this was sufficient notice to invoke the option to purchase.

The Pitcocks also rely upon the equitable doctrine of disproportionate forfeiture (defined later) as a defense against the claims that they failed to conform to the ninety-day notice requirement.

In a trial to the court at which only Jack Besteman and Jerry Pitcock testified, the testimony was somewhat controverted as to the efforts made by Pitcock to orally communicate the intention to exercise the option to purchase.

Pitcock testified that he had attempted unsuccessfully on a number of occasions to reach Besteman by telephone and had tried on one occasion to find him at home, all with the intention of communicating his intention to exercise the option to purchase; Pitcock further said that on the occasion of paying the annual rent, he had requested that he be allowed to simply complete the

4

purchase at that time rather than waiting the additional year; and that on another occasion, he had attempted to persuade Besteman to terminate the lease by completing a sale of the property. Pitcock testified further that the course of his actions on the property by improving the ponds, clearing of underbrush, the construction of a concrete pad as a horse-washing area, and fertilizing the property was evidence of the intention of the Pitcocks to exercise their option to purchase, this evidence being tantamount of notice of their intention to purchase. However, on cross-examination, it was shown that the $15,000.00 statement which was presented as evidence of the Pitcocks' investment in clearing the property was from Joanne Pitcock's father, and the Pitcocks were unable to particularize the services which had been performed and indicated that these services were not paid for in cash. Pitcock also admitted that fertilization of the property was a part of good husbandry of the property (although he indicated that he would not have fertilized as much had he not believed he would be able to purchase), that some of the billing statements he presented were for work done on other property, and that the oats which had been sown were to feed deer and the oats provided benefits only during the term of the lease.

Besteman responded by indicating that he was not difficult to reach by telephone and he indicated doubt that someone would be unable to find him (or someone in his family) at his house as Pitcock had testified, that he had no recollection of Pitcock's expression of interest in purchasing the property at the time Pitcock paid the second year's lease amount or any other time during the two-year term of the lease, that he was unaware of the actions taken by Pitcock on the property, and that

5

he had believed that the Pitcocks' desire to purchase the property was contingent on their ability to sell their house (which continued to be for sale throughout the entire two-year term of the lease). Besteman also indicated that he erroneously believed that the certified-mail notice sent by the Pitcocks had to do with a contested medical bill and that he was unaware that it was intended to be a notice from the Pitcocks expressing their intention to purchase.

The trial court then requested letter briefs from the parties. In the post-trial brief filed by the Pitcocks, disproportionate forfeiture was first raised as a theory of recovery.[1]

The trial court gave judgment in favor of the Pitcocks, ordering specific performance and awarding attorneys' fees; the trial court also entered detailed findings of fact and conclusions of law. The Bestemans have perfected their appeal to this Court, raising three primary points of error (with subpoints): (1) the trial court erred in granting specific performance relief, (2) the trial court erred in six of the findings of fact and conclusions of law, stating that none of the six were supported by evidence and that each was manifestly erroneous, and (3) the trial court erred in awarding attorneys' fees to the Pitcocks.

Although their brief indicates that the complained-of findings of fact and conclusions of law are "without evidence to support" them and that they are "manifestly erroneous," the Bestemans do not specify whether their challenge to the various findings of fact regard their legal sufficiency or their factual sufficiency.

---

[1]No objection was lodged by the Bestemans that this equitable theory was not pleaded, either at the trial level or on appeal.

Questions of law are reviewed de novo. *City of San Antonio v. TPLP Office Park Props.*, 218 S.W.3d 60, 66 (Tex. 2004). Questions of fact resolved by the trial court are subject to the same legal and factual sufficiency standards as jury findings. *In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000).

The test for the legal sufficiency of evidence is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In making this kind of determination, the Court credits favorable evidence if a reasonable fact-finder could, and disregards contrary evidence unless a reasonable fact-finder could not. *Id.* So long as the evidence falls within the zone of reasonable disagreement, the Court may not substitute its judgment for that of the fact-finder. *Id.* at 822. The trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id.* at 819. In determining a no-evidence issue, the Court is to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex. 2001); *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996).

In contrast, when making a factual sufficiency review, the Court considers and weighs all the evidence and will set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Vickery v. Vickery*, 999 S.W.2d 342, 376 (Tex. 1999) (op. on reh'g); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

7

In the briefs filed with the trial court and on appeal, the Pitcocks rely upon a variety of legal postures and equitable remedies, which rest upon varied factual findings and legal conclusions. Some of the findings or conclusions are necessary to some of the theories of recovery, but not others. These findings or conclusions include a conclusion that oral notification by the Pitcocks of their intent to exercise the option sufficed, a conclusion that a failure to compel specific performance would produce unconscionable results, a finding of accident or mistake in a failure to provide written notice, a finding that a prospective purchaser was not in default in its obligations and had substantially complied, and others. Because resolutions of the points of error raised by the Bestemans rely heavily on an analysis of the accuracy and applicability of the findings of fact and conclusions of law entered by the trial court, we have examined these points of error first so they can be applied later to the other points raised on appeal.

The findings of fact and conclusions of law filed by the trial court are numbered together and the findings of fact are not differentiated from the conclusions of law. Some of the individually numbered items in the findings of fact and conclusions of law include both findings of fact and conclusions of law.

## I. POINTS OF ERROR RELATED TO FINDINGS OF FACT / CONCLUSIONS OF LAW

### A. Conclusion that Oral Notice of the Exercise of the Option to Purchase Was Sufficient

The trial court's finding/conclusion number 20 states that "The oral notifications given by [the Pitcocks] . . . were sufficient to comply with the . . . Notice Provision of the Lease, inasmuch as the Notice Provision specifically provides in its last sentence that 'Notices delivered otherwise will be effective on receipt.'" This portion of the trial court's finding of fact and conclusion of law presents a question of law and is, therefore, reviewed de novo on appeal.

### 1. General Rule: Strict Compliance

It is a well-settled principle that strict compliance with the provisions of an option contract is required. *See Jones v. Gibbs*, 133 Tex. 627, 130 S.W.2d 265, 271 (Tex. Comm'n App. 1939, opinion adopted); *Crown Constr. Co. v. Huddleston*, 961 S.W.2d 552, 558 (Tex. App.—San Antonio 1997, no pet.). Except in rare cases of equity, acceptance of an option must be unqualified, unambiguous, and strictly in accordance with the terms of the agreement. *Crown Constr.*, 961 S.W.2d at 558 (citing *Zeidman v. Davis*, 161 Tex. 496, 342 S.W.2d 555, 558 (1961)).

In a concurring opinion, former Chief Justice Cornelius of this Court accurately explained the nature of an acceptance of an option:

> An option is unilateral. It imposes no liability on the optionee unless and until he exercises the option according to its terms. Acceptance of an option, unless excused on equitable grounds, must be unqualified, unambiguous, and strictly in accordance with its terms. Any failure to exercise an option according to its terms, including an

9

untimely or defective acceptance, is simply ineffectual, and legally amounts to nothing more than a rejection. Consequently, an acceptance that does not comply with the option's terms, unless it is accepted by the optionor, binds neither the optionee nor the optionor.

*Atterbury v. Brison*, 871 S.W.2d 824, 829 (Tex. App.—Texarkana 1994, writ denied) (citations omitted) (Cornelius, C.J., concurring).

Both parties concur that no written notice of the intention to exercise the option was delivered by the Pitcocks to the Bestemans within the time frame specified in the contract. It is necessary, then, to look to the agreement to determine whether the agreement allows for an alternative means by which such a notice could be given.

### 2.    Relevant Terms of the Agreement

As quoted before, the option paragraph of the contract says the Pitcocks were to notify the Bestemans of their intention to exercise the option to purchase "90 days before the 24 month lease period expires." Though not clearly outlined in the rather short provision of the contract, the parties have read the language as requiring notice *before* the ninety-day period preceding the end of the two-year lease term. The final date that notice could be given under the contract was June 19, 2006.

The general notice provision of the agreement is found as follows in paragraph 18:

Any notice required, or permitted to be delivered hereunder must be in writing, and all notices and payments of rent will be deemed received on the date they are deposited in the United States mail, certified mail or registered mail, postage prepaid, return receipt requested, addressed to Lessor or Lessee as the case may be, at the address shown above, or at such other place as the Lessor or Lessee may from time to time designate by written notice as provided in this paragraph. Notice delivered otherwise will be effective upon receipt.

10

### 3. Is the Notice Provision Ambiguous?

Whether a provision in a contract is ambiguous is answered by looking at the entire contract and giving effect to each provision. *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). If a contract is worded so that a court may properly give it a definite or certain legal meaning or interpretation, then it is not ambiguous. *Crown Constr.*, 961 S.W.2d at 556. A contract is ambiguous only when there exists a genuine uncertainty as to which of two meanings is proper. *Id.* However, an ambiguity does not exist simply because the parties advance conflicting interpretations of the contract. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994); *Crown Constr.*, 961 S.W.2d at 556. In order for an ambiguity to exist, both interpretations must be reasonable. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995); *Crown Constr.*, 961 S.W.2d at 556.

The Bestemans maintain that written notice of the intent to exercise the option was required by the agreement. The Pitcocks seize on the final sentence of paragraph 18 and the use of the words "delivered otherwise" as permitting oral notice of the intent to exercise the option in lieu of a written notice. This interpretation would completely negate the first sentence of the paragraph, which plainly states that all notices "must be in writing." Therefore, to give those words the meaning urged by the Pitcocks would violate one of the principal tenets of contract construction.

> In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. To achieve this objective, courts should examine and consider the entire writing in an effort to

11

> harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.

*Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005) (citations omitted).

It is plain that the "delivered otherwise" wording of the contract pertains to the manner of delivery of the notice which (as is stated in another part of the contract) "must be in writing." To find otherwise, the writing requirement would mean nothing. Impliedly, the trial court determined that the contract was ambiguous; it is not.

We, therefore, determine that the court erred in its finding that the contract exculpated the Pitcocks from delivering a written notice of their intention to exercise the option to purchase; in so doing, we determine that under this contract, it was necessary to deliver a written notice of the exercise of the option before the right to purchase under the contract was invoked.

**B.      Reliance on Principles Set Out in *Farris v. Bennett's Executors*, 26 Tex. 568 (1863) and *Advanced Components, Inc. v. Goodstein*, 608 S.W.2d 737 (Tex. Civ. App.—Dallas 1980, writ ref'd n.r.e.)**

The *Farris* case set forth elements which tend toward specific enforcement of a contract through the application of equity. The trial court's finding/conclusion number 26 accurately summarizes those elements in stating that the person seeking specific performance was not in default of its obligations and that it had substantially complied with the duties required under it. In *Farris*, the Texas Supreme Court then determined that where there was not strict compliance with the terms of the contract, the noncompliance did not go to the essence of the contract itself and, therefore, did not bar the remedy of specific performance.

12

In *Advanced Components*, the Dallas Court of Appeals excused strict compliance with the terms of a contract to purchase in a situation in which (a) the proposed seller would, if the contract were enforced, obtain the benefit which it reasonably anticipated when entering the contract; (b) the proposed purchaser could not be adequately compensated in damages for the lack of complete performance; (c) the proposed purchaser had completely performed its obligations pursuant to the contract and made preparations for continued performance; (d) greater hardship would devolve on the proposed purchaser than on the proposed seller if specific performance were not ordered; and (e) the motivation of the proposed seller in refusing to carry through with the purchase and sale was found to be greed.

However, neither of these cases is on point. In the *Farris* case, there was never any lease or any option to purchase; rather, the parties had made an agreement for the purchase and sale of real estate conditioned upon the purchaser performing certain conditions—conditions which were substantially performed. In the *Advanced Components* case, although there had been an option to purchase granted, the option had been duly exercised; the performance of the purchase was the thing at issue. The law is clear in Texas that an option to purchase is a unilateral contract which does not ripen into a mutually binding obligation until acceptance by the optionee. *Kenver Corp. v. Robinson*, 492 S.W.2d 317, 319–20 (Tex. Civ. App.—Beaumont 1973, writ ref'd n.r.e.); *Leggio v. Millers Nat'l Ins. Co.*, 398 S.W.2d 607 (Tex. Civ. App.—Tyler 1965, writ ref'd n.r.e.); *Hankey v. Employer's Cas. Co.*, 176 S.W.2d 357, 362 (Tex. Civ. App.—Galveston 1943, no writ).

Until the time that the Pitcocks complied with the requirement that they give notice of the exercise of their option to purchase, the substantial object of the contract between them and the Bestemans was a pasture lease; the Pitcocks had the right of use of the property and possessed the unilateral right to exercise the option to purchase. Had the Pitcocks given notice as under the contract that the option to purchase had been exercised, it would have then transformed the unilateral right to purchase into a bilateral contract for the purchase and sale; once a notice of the intention to exercise the option was given, the substantial object of the contract would have been transformed from the lease of the property to the purchase of it.

The tenets set forth in *Farris* and *Advanced Components* both deal with contracts for the purchase of land; they do not apply to options to purchase real estate. Accordingly, the findings/conclusions numbered 26 and 27 are incorrect statements of the law as they apply to this case. It was error, therefore, to apply the law in *Farris* and *Advanced Components* to the circumstances of this case.

**C.** **Finding that the Pitcocks' Failure to Comply with the Option to Purchase was Due to Mistake**

The trial court's finding/conclusion number 28 made the factual finding that "Any failure on [the Pitcocks'] part to comply with the Option to Purchase was due at most to a mistake in what was necessary." After a careful reading of the record, it is quite clear that although there was substantial testimony regarding the Pitcocks' attempts to provide oral notification of their intention to exercise the option to purchase, there was simply no evidence provided at trial for the reason that no written

14

notice was tendered. Although one might assume that this failure was due to an error and not through contumacious disregard of that requirement, that assumption would be required in order to arrive at the factual finding above.

As pointed out in *Kroger Texas Limited Partnership v. Suberu*,

A challenge to the legal sufficiency of evidence will be sustained when, among other things, the evidence offered to establish a vital fact does not exceed a scintilla. Evidence does not exceed a scintilla if it is "so weak as to do no more than create a mere surmise or suspicion" that the fact exists.

216 S.W.3d 788, 793 (Tex. 2006) (quoting *Ford Motor Co. v. Ridgeway*, 135 S.W.3d 598, 601 (Tex. 2004); *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

Accordingly, we find that since there was no evidence introduced regarding the motivation of the Pitcocks in their failure to provide the required written notice of their intention to exercise the option to purchase, the evidence is legally insufficient to support this finding of fact. Therefore, we sustain this point of error.

**D.      Finding that the Pitcocks Made a Good-Faith Effort to Comply With the Terms of the Lease and Were Not Guilty of Willful or Gross Negligence**

In its finding/conclusion number 29, the trial court made two findings of fact: (1) that the Pitcocks had made a good-faith effort to comply with the terms of the lease and (2) that they were not guilty of any acts which would amount to willful or gross negligence.

15

Although the finding of a lack of willful or gross negligence does not specify what the negligence would regard, we assume that it pertains to the Pitcocks' failure to provide a written notice of their intention to exercise the option to purchase.

However, as pointed out above, although Pitcock testified about the oral communications he had made regarding the intentions he had at the outset to purchase the land and the work he had performed on the land, he never proffered an explanation for the reason for the forty-nine-day delay in giving the required written notice he would need to deliver in order to exercise the option to purchase. In order to arrive at the conclusion that neither willful nor gross negligence prompted the failure to deliver the required notice, one must infer that from the conduct of the Pitcocks. Under the circumstances of this case, this inference amounts to no more than a guess or a surmise. One could just as easily infer that the Pitcocks were contumaciously and obdurately refusing to provide a written notice as to infer that they were inadvertently doing so.

Had there been even a scintilla of evidence presented which supported the finding that the Pitcocks were motivated by something which did not amount to either willful or gross negligence in not having presented a written notice of their intention to exercise the option, then this finding of fact would be legally sufficient. *See Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex. 1993). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence. *Kindred v. Con/Chem, Inc.*,

16

650 S.W.2d 61, 63 (Tex. 1983). However, failing that, we find the evidence to be legally insufficient to support this finding, and we sustain this point of error.

**E.      Finding that Denial of Specific Performance Would Result in Unconscionability Because of Valuable Improvements Which the Pitcocks Had Made to the Property and Had Anticipated the Construction of a House On It**

Although Merriam Webster's Collegiate Dictionary defines the term "unconscionable" to mean "shockingly unfair or unjust," MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1362 (11th ed. 2006), Texas courts have determined that the term carries no precise legal definition. *In re Marriage of Smith*, 115 S.W.3d 126, 135 (Tex. App.—Texarkana 2003, pet. denied); *Arthur's Garage, Inc. v. Racal-Chubb Sec. Sys.*, 997 S.W.2d 803, 815 (Tex. App.—Dallas 1999, no pet.). Unconscionability must be determined on a case-by-case basis in light of a variety of factors. *See Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 498 (Tex. 1991) (Gonzalez, J., concurring); *Lee v. Daniels & Daniels*, 264 S.W.3d 273 (Tex. App.—San Antonio 2008, pet. filed).

Whether unconscionability exists is a matter of law, not a matter of fact. *Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 562 (Tex. 2006). However, that determination

> is dependent upon the existence of facts which allegedly illustrate unconscionability. And, as to the existence of those facts, our review is not *de novo*. In other words, we cannot review the record, divine our own inferences from the evidence contained therein, resolve conflicts in same, or decide what evidence to believe and what not to believe. The power to do those things, that is, to find facts, lies with the trial court. Once it has exercised that power, we must then defer to the findings made. And, as long as the findings enjoy sufficient evidentiary support, they cannot be disturbed, even though we may have construed the evidence differently. Nevertheless, this does not prevent us from assessing whether the findings made illustrate unconscionability for, again, that is a question of law. Nor does it prevent us from deciding whether the

17

> evidence of record, when viewed in a light most favorable to the court's findings and regardless of its potential inferences, illustrates unconscionability, for that too is a question of law.

*El Paso Natural Gas Co. v. Minco Oil & Gas Co.*, 964 S.W.2d 54, 60–61 (Tex. App.—Amarillo 1997), *rev'd on other grounds*, 8 S.W.3d 309 (Tex. 1999), as quoted in *Ski River Dev., Inc. v. McCalla*, 167 S.W.3d 121, 136–37 (Tex. App.—Waco 2005, pet. denied).

In this case, the future intention or anticipation of the Pitcocks to construct a house on the property the subject of the agreement is not a factor to consider in determining whether unconscionable consequences will result if they are unable to complete the purchase which they seek. Accordingly, this desire is discounted in making this determination.

Further, although the complained-of finding of fact indicates that the Pitcocks made "valuable improvements" to the real estate, the trial court did not indicate in its findings which of those improvements had been considered by the court. Virtually all of the things which the Pitcocks claimed they made as valuable improvements were contested by the Bestemans. More importantly, in the record, none of the alleged improvements were itemized as to cost in any manner that would allow segregation of true permanent improvements from contractually required maintenance items, funds spent on other property, items for which nothing was actually spent, or items which were not improvements at all. Accordingly, we are left with a rather amorphous finding of fact regarding improvements which leaves us little guidance to aid us in determining whether the facts as found would support unconscionability as a matter of law.

18

As mentioned above, the Pitcocks claimed to have improved ponds, cleared underbrush, installed a concrete pad for washing horses, and fertilized the property. But even the concrete pad (which seems to be the only clearly identifiable real and permanent improvement to the property) and the pond improvements (which are less clearly real and permanent improvements) are not associated with any clearly segregated costs shown in the evidence. It is impossible to determine from the findings/conclusions which of the alleged expenditures were found by the trial court to have been the basis for the trial court's finding of unconscionability.

The word "unconscionable" can be employed in at least two distinct circumstances in Texas contracts which are not governed by specific statutes dealing with unconscionability: unconscionability of contracts and unconscionability of results. Without delving deeply into the nuances of what defines an unconscionable contract, it is basically one which is "grossly one-sided." *In re Poly-America, L.P.*, 262 S.W.3d 337, 348 (Tex. 2008). The Pitcocks make no claim that the contract or any provision of it (including the requirement that timely written notice of the intent to exercise the option be given) is unconscionable, only that strict enforcement of the notice provision of the option would render the results unconscionable. Therefore, this is a case involving a claim of unconscionable results. Although cases involving unconscionable contracts are not strictly on point in this case, a review of unconscionability in that context is illustrative of the kinds of things which courts find to be unconscionable.

19

Unconscionability tends to exist when certain, rather extreme, factors are involved in a contract. For example, unconscionability aims "to prevent oppression and unfair surprise." *Poly-America, L.P.*, 262 S.W.3d at 348. Often, a disparity in bargaining power can result in oppression or unreasonableness that is labeled "unconscionable." *See Saenz v. Martinez*, No. 04-07-00339-CV, 2008 Tex. App. LEXIS 8297, at *25–28 (Tex. App.—San Antonio Nov. 5, 2008, no pet. h.). Unconscionability has been found when there is a "gross disparity in the values exchanged" and the "grounds for substantive abuse [are] sufficiently shocking or gross to compel the court to intercede." *McCalla*, 167 S.W.3d at 136.

> The test for substantive unconscionability is whether, "given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract."

*In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 678 (Tex. 2006) (quoting *In re FirstMerit Bank*, 52 S.W.3d 749, 757 (Tex. 2001)); *Lawson v. Archer*, Nos. 14-07-00324-CV & 14-07-00429-CV, 2008 Tex. App. LEXIS 5976, at *11–12 (Tex. App.—Houston [14th Dist.] July 31, 2008, [1 case–no pet.], [1 case–no pet. h.]).

> [A] contract or contract provision is not invariably substantively unconscionable simply because it is foolish for one party and very advantageous to the other. Instead, a term is substantively unreasonable where the inequity of the term is so extreme as to shock the conscience.

*Anaheim Indus. v. GMC*, No. 01-06-00440-CV, 2007 Tex. App. LEXIS 9950, at *28–29 (Tex. App.—Houston [1st Dist.] Dec. 20, 2007, pet. denied). The high threshold a party must meet in

proving unconscionability is based on a strong policy favoring the freedom of contract. *Churchill Forge, Inc. v. Brown*, 61 S.W.3d 368, 371 (Tex. 2001) (Texas has "strong commitment to the principle of contractual freedom").

Reviewing the evidence as presented, we find as a matter of law that the loss of the claimed permanent improvements by the Pitcocks—especially given a potential tax cost to the Bestemans caused by the substantial delay in notice—would not result in an unconscionable circumstance; to the contrary, we find that the trial court erred in its ruling that it would be unconscionable to enforce the contract's requirement that written notice of the exercise of the option be given on a timely basis.

We sustain this point of error.

## II.     POINTS OF ERROR RELATING TO GRANT OF SPECIFIC PERFORMANCE OF CONTRACT

The Bestemans complain that the trial court erred in granting specific performance based upon principals of equity.

The *Jones* case is the touchstone case for the equitable principal known as "disproportionate forfeiture." *Jones*, 130 S.W.2d at 271. The opinion included a verbatim quote of a Connecticut case[2] in saying,

> In cases of mere neglect in fulfilling a condition precedent of a lease, which do not fall within accident or mistake, equity will relieve when the delay has been slight, the loss to the lessor small, and when not to grant relief would result in such hardship to the tenant as to make it unconscionable to enforce literally the condition precedent of the lease.

---

[2]*F. B. Fountain Co. v. Stein*, 118 A. 47, 50 (Conn. 1922).

*Id.* The Pitcocks rely heavily on *Jones* and, rather surprisingly, upon *Cattle Feeders, Inc. v. Jordan*, 549 S.W.2d 29, 33 (Tex. Civ. App.—Corpus Christi 1977, no writ), for the proposition that equity relieves them from the requirement to strictly comply with the notice requirements for the exercise of an option.

In *Jones*, Gibbs had purchased timber under a timber deed with the right to remove the timber for ten years. *Jones*, 130 S.W.2d at 266. The timber deed gave Gibbs a right, "in the nature of an option," to extend the time to remove the timber for five years by the payment of an annual fee of $205.68. *Id.* at 268. At the end of the ten-year period, two-thirds of the timber remained uncut. *Id.* at 267. Under written direction from the administrator of the grantor's estate, Gibbs paid the first annual extension fee to a creditor of the estate. *Id.* at 270–71. Gibbs paid the next year's fee to the creditor as well, without written direction, but after the administrator had talked to the creditor about receiving the extension fee as a credit. *Id.* at 271. Later, the administrator objected to Gibbs's method of payment of the fee and filed suit to declare the timber deed expired.

The Texas Commission of Appeals concluded the right was extended when Gibbs timely paid, at the administrator's direction, the annual rental fee to the creditor: "[T]he testimony, including that of [the administrator], which we have carefully examined, in our opinion clearly shows that [the administrator] gave his consent that this rental be paid to [the creditor] and intended, at least until after its payment, that it should be so paid." *Id.* at 270–71. The commission then assumed that if the evidence did not establish the authorization to make the payment to the creditor,

22

the case was one for application of equity to excuse failure to strictly comply with the terms of an option.[3] So, even if the administrator did not expressly authorize payment of the second annual extension fee in such a way, Gibbs was nevertheless acting under the honest and justifiable, albeit mistaken, belief that such payment was authorized as it had been the year before. *See id.*

As noted above, the *Jones* case listed one of the circumstances giving rise to the invocation of the equitable doctrine as being "when the delay has been slight." *Jones*, 130 S.W.2d at 272. That is not the circumstance here. The Pitcocks did not give written notice of their intention to exercise the option until forty-nine days into the ninety-day notice period. Further, there was some culpability on the part of the landowner in the *Jones* case in directing that payment to extend the option be made elsewhere; there is nothing comparable here.

In the *Cattle Feeders, Inc.* case, Cattle Feeders, Inc., as lessee, and the Jordans, the lessors/landowners, entered into a five-year lease with an option to purchase the land. 549 S.W.2d at 31. The agreement required that the cattle company give a ninety-day written notice of its intent

---

[3]Because *Jones* presented the equitable analysis as an alternative basis, the Dallas court characterized the discussion as dictum. *See Reynolds-Penland Co. v. Hexter & Lobello*, 567 S.W.2d 237, 240 (Tex. Civ. App.—Dallas 1978, writ dism'd by agr.) (refusing to apply the rule, dismissing *Jones* language as mere dictum, and concluding the result in *Jones* rested on finding the option was properly exercised). The Dallas court fairly recently reiterated its position on *Jones*. *See Probus Props. v. Kirby*, 200 S.W.3d 258, 264 (Tex. App.—Dallas 2006, pet. denied) (concluding "that the discussion of the doctrine of disproportionate forfeiture was not necessary to the decision in *Jones* because the commission concluded the evidence established the administrator had directed the payment be made to the creditor of the estate").

23

to exercise the option to purchase.[4] At the expiration of the lease period, Cattle Feeders sent a letter to the Jordans in which it tendered the first purchase payment for the land pursuant to the terms set out in the option agreement, a payment which the Jordans refused. *Id.* Cattle Feeders then brought an action against the Jordans, seeking specific performance of the option agreement. The Jordans filed a motion in limine to exclude from the jury all of the evidence that pertained to waiver or estoppel on the part of the Jordans, and the trial court granted the motion.

Cattle Feeders contended that the Jordans engaged in conduct that excused strict compliance with the terms of the option agreement and that the trial court erred in refusing to allow Cattle Feeders to present this evidence to the jury. This evidence, argued Cattle Feeders, would entitle it to equitable relief under *Jones*. The excluded evidence included testimony from an individual who sought to testify that he had cleared some of the land for Cattle Feeders, charging between $3,670.00 and $3,850.00 for those services. *Id.* at 31–32. Cattle Feeders's president also testified that the original lease agreement was entered into to gain a tax advantage for the Jordans. *Id.* at 32. The same witness further testified that Cattle Feeders cleared the land, graded the land for the appropriate slope for a feed yard, built ponds on the land, constructed a mobile home park for its employees, and made substantial expenditures on fences, fertilizer, and seed. *Id.* He, similarly to the testimony of Pitcock in this case, testified that the company would not have made such expenditures if it was not

---

[4]Although there was some suggestion that the cattle company had mailed a letter in April or May 1971 notifying Jordan of its intent to purchase the land, that issue was not presented to the Corpus Christi court and it expressly did not touch on that issue. *Cattle Feeders*, 549 S.W.2d at 31.

"under the impression" that Cattle Feeders would acquire the land. *Id.* Mrs. Jordan also testified, explaining that she had observed all the improvements made and that she always thought Cattle Feeders would purchase the land, but never knew with certainty. *Id.* She testified that she had received no communication from Cattle Feeders indicating its intent to exercise its option to purchase the land. *Id.*

After briefly summarizing the principles outlined by *Jones*, the Corpus Christi court affirmed the trial court's order, concluding that there was no evidence in the record that Cattle Feeders's failure to provide timely notice of its intent to exercise the option was the result of an honest and justifiable mistake. *Id.* at 32–33. The *Cattle Feeders* case does add by dictum another thing to consider, that being

> An optionee will be excused from strict compliance where his conduct in failing to comply was not due to willful or gross negligence on the part of the optionee but was rather the result of an honest and justifiable mistake. In addition, equity will also excuse strict compliance where the strict compliance was prevented by some act of the optionor such as waiver or misleading representations or conduct.

*Id.* at 33.

In this case (as in *Cattle Feeders*), although Pitcock testified about the oral communications he had made and the work he had performed on the land, he never proffered an explanation for the reason for the forty-nine-day delay in giving the required written notice.

In summary, the Pitcocks failed to proffer an explanation for their failure to make timely compliance with the written notice requirement of their notice of intention to exercise their option,

25

and the delay in delivering the required notice was not slight. We have determined as a matter of law that loss of their ability to purchase will not operate to damage the Pitcocks. Accordingly, the equity of disproportionate forfeiture does not apply in this case.

## III.   ERROR IN THE AWARD OF ATTORNEYS' FEES

Attorneys' fees are recoverable from an opposing party only as authorized by statute or by contract between the parties. *Travelers Indem. Co. of Conn. v. Mayfield*, 923 S.W.2d 590, 593 (Tex. 1996).

The suit instituted by the Pitcocks was brought both to enforce a contract and pursuant to the Declaratory Judgments Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.001–.011 (Vernon 2008). Under the pleadings, attorneys' fees could be awarded pursuant to either Section 38.001(8)[5] or Section 37.009[6] of the Texas Civil Practice and Remedies Code.

An award of "equitable and just" attorneys' fees under an action for declaratory judgment is within the discretion of a trial court. TEX. CIV. PRAC. & REM. CODE ANN. § 37.009; *Commissioners Court v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997).

---

[5]"A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for: (1) rendered services; (2) performed labor; (3) furnished material; (4) freight or express overcharges; (5) lost or damaged freight or express; (6) killed or injured stock; (7) a sworn account; or (8) an oral or written contract." TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (Vernon 2008).

[6]In any proceeding under this chapter, the trial court may award costs and reasonable and necessary attorneys' fees as are equitable and just.

However, under Section 38.002 of the Texas Civil Practice and Remedies Code, the award of reasonable attorneys' fees to the prevailing party in a breach of contract case is mandatory if there is proof of the reasonableness of the fees. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (Vernon 1997); *Hassell Constr. Co. v. Stature Commercial Co.*, 162 S.W.3d 664, 668 (Tex. App.—Houston [14th Dist.] 2005, no pet.). The amount of the award lies within the discretion of the trial court but it does not have the discretion to deny attorneys' fees if they are proper. *Hassell Constr. Co.*, 162 S.W.3d at 668.

Considering that the outcome of this case is changed, it will fall to the trial court to make a determination of the award of attorneys' fees awarded between and among the parties.

Accordingly, we reverse the judgment of the trial court in ordering the Pitcocks the requested specific performance and attorneys' fees, render a declaratory judgment that the option to purchase expired, and remand this matter to the trial court to make a determination of the merit of the Bestemans' claim for recovery of unpaid rentals during the holdover period from the date of the expiration of the two-year lease, and for reconsideration of the award of attorneys' fees.


Bailey C. Moseley
Justice

Date Submitted:     October 29, 2008
Date Decided:       December 5, 2008

27