

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

_____

No. 06-12-00024-CV
_____

ROBERT ROWE AND THERESA ROWE, Appellants

V.

JUDY DORMAN AND RONDA MILLER, Appellees

On Appeal from the 124th Judicial District Court
Gregg County, Texas
Trial Court No. 2011-791-B

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

On January 31, 2006, Robert and Theresa Rowe entered into a fifteen-year lease agreement with Ronda Miller for a building and grounds for the operation of Miller's child daycare center, which operates under the name of Treazure Chest Daycare. The agreement was of the lease-purchase variety and granted Miller the option to convert the lease into a contract for purchase of the property.

The conflicts between Miller and the Rowes came to a head on March 21, 2011, when Miller gave written notice to the Rowes of her intent to exercise the option to purchase. The Rowes did not take action toward that end, but on March 28, responded with a letter stating that the lease had been terminated and demanding that Miller vacate the premises by March 31. Miller sued and obtained a declaratory judgment requiring performance of the purchase agreement.

The controversy between Miller and the Rowes involves Miller's attempt to exercise that option to purchase and the question of whether Miller had lost the right to purchase due to certain breaches of the lease agreement made by her. The suit was originally brought by Miller and Judy Dorman seeking injunctive relief against the Rowes and seeking a declaratory judgment regarding the right of Miller to purchase under the lease purchase agreement.[1]

---

[1] Miller granted Dorman a power of attorney to represent Miller in the matters pertaining to the Treazure Chest Daycare. Dorman had signed the lease purchase agreement as attorney-in-fact for Miller and also signed an affidavit supporting Miller's claim for injunctive relief. The record seems to indicate that the sole position of Dorman in this matter is her representative capacity as attorney-in-fact for Miller and not in her individual capacity. The file does not reflect why she is shown as a party in her own right. Since the judgment recites that Miller entered into the lease purchase agreement and does not mention Dorman, we treat Miller as the sole litigant on her side of the controversy, despite the addition of Dorman's name in the pleading.

The trial court first granted a temporary injunction, enjoining the Rowes from interfering with Miller's use and occupancy of the building. At a final hearing before the trial court, Miller was granted a declaratory judgment which found that although Miller had not timely performed some of her obligations under the lease purchase agreement, she had not forfeited her rights under the agreement and still possessed a right to purchase. The judgment then directed the Rowes to perform under the term of the lease following Miller's notice of exercise of the option to purchase. The judgment also awarded attorney's fees to Miller against the Rowes. The Rowes have appealed.

The Rowes argue on appeal that Miller did not fully perform her obligations under the lease by not timely making all payments required and thus had no right to exercise the option.

We find no error and affirm.

**The Contract—Lease With Option to Purchase Agreement**

The contract is relatively lengthy and specifies a monthly rental of $2,251.58, payable on or before the first day of each month and authorizes the imposition of a late charge of five percent of the past-due installment if rent is not received within five days of the due date. Further provisions specify that Miller is to pay all ad valorem taxes assessed against the property as they become due, but allows the Rowes to satisfy those taxes themselves if not paid in a timely manner and assess such payments as additional rentals (with interest and a lien for repayment). Miller is also obligated to maintain insurance on the property, indemnify the Rowes for any claims, keep the property properly maintained, and timely pay the utilities.

The Rowes focus their attention on Article 10 of the lease agreement (which is the article dealing with default). Article 10.01 provides for default in certain circumstances. In relevant part, it provides that Miller (the lessee) would be in default if:

> (i) Lessee shall fail to perform or comply with any of the terms, provisions, covenants or conditions of this Agreement, and such failure shall have continued for fifteen (15) days after written notice from Lessor to Lessee of such failure; [or] (ii) Lessee shall fail to pay to Lessor any rent or any other monetary charge due from Lessee hereunder as and when due and payable . . . .

Article 10 goes on to provide for remedies for default, listing a substantial number of options, including self-help and re-entry.[2]

Article 11 of the contract contains the option for purchase by Miller and states that this option is conditional, "provided Lessee shall have fully performed Lessee's obligations. . . ." It goes on to say that in the event that the option to purchase is exercised, all amounts of rent (but no late charges or penalties) should be applied against the purchase price. It goes on to prescribe that notice of the exercise of the option to purchase is to be made by delivery of written notice and that within a reasonable time after receipt of notice, lessor is to deliver to lessee a

---

[2]Although Article 10.04 of the lease agreement is a "non-waiver" provision which purports to exculpate a lessor from the consequences of a waiver upon the failure to complain about nonperformance of the lease and although the Rowes mention this Article in the statement of facts in their brief, they have not provided this Court with any argument on appeal that the trial court's findings were erroneous based upon a failure to apply that provision. When an argument is not presented to this Court, we may not create such an argument, and we will err if we reverse on that ground in the absence of properly assigned error. *Pat Baker Co. v. Wilson*, 971 S.W.2d 447, 450 (Tex. 1998) (per curiam); *Aluminum Chems. (Bolivia), Inc. v. Bechtel Corp.*, 28 S.W.3d 64, 68 (Tex. App.—Texarkana 2000, no pet.) ("It is not the proper function of this Court to create arguments for an appellant. We are restricted to addressing the arguments actually raised, not those that might have been raised."). Even had they done so, such provisions have been reviewed by this Court and by others, and we have recognized that such a "non-waiver" clause could itself be waived, depending upon the facts of the case. *Winslow v. Dillard Dep't Stores, Inc.*, 849 S.W.2d 862, 863–64 (Tex. App.—Texarkana 1993, writ denied); *Zwick v. Lodewijk Corp.*, 847 S.W.2d 316, 318 (Tex. App.—Texarkana 1993, writ denied).

commitment for title insurance. The document completes this by prescribing the division of closing expenses and other adjustments necessary to complete the transaction.

**The Position of the Rowes**

In their sole point of error, the Rowes argue that because the failure of Miller to make all lease payments in a timely fashion, this was a fatal nonperformance of her obligations that caused her to forfeit her right to purchase under the agreement. Specifically, they point out that she habitually paid rental payments after the first of the month (although the payments were typically made before the fifth of the month), that the ad valorem taxes (although eventually paid) were paid late on several occasions, and that Miller did not pay utility bills timely on several occasions, resulting in disconnect/cancellation notices and at least twice by actual termination of the service (followed by payment of reconnect fees and the recommencement of service).

The Rowes also contend that Miller was in breach because she did not fulfill her obligation to fully comply with all regulatory requirements governing the use of the property as a child daycare center. In support of that position, the Rowes point us to the results of several inspections.[3] Violations of varying degrees of indicated importance were noted by governmental inspectors or regulators, but there is no indication the violations were of such severity or duration that the operation of the child daycare business was ever in jeopardy due to those violations, and it appears that all were corrected to the regulatory entity's satisfaction (or, at a minimum, that no

---

[3]The object of this evidence is apparently an attempt by the Rowes to demonstrate that Miller had operated a child daycare center on the demised premises in noncompliance with law or regulations and, hence, had violated the lease agreement. Paragraph 6.02 of the lease agreement is a covenant by the lessee to comply "strictly and in all respects with the requirements of any applicable law . . . , regulation or order pertaining to health . . . ."

further action was deemed warranted or taken by the regulatory authorities as a result of those shortcomings).

The Rowes argue that absolute and strict compliance with all terms by Miller was required in order for her to exercise her option to purchase; absent such strict compliance, Miller is in default of the lease purchase agreement. Therefore, under their reasoning, since Miller has not complied with all precedent conditions necessary to be entitled to exercise the lease option to purchase, she no longer possesses the right to exercise the option to purchase.

We also note that the evidence shows a consistent overpayment of rent by Miller, typically by about $400.00 per month for every month during the period of the lease. Although the lease prescribed the monthly installments of rent to be $2,251.58 each, many of the rental checks delivered to the Rowes were for the greater sum of $2,669.92. By the time Miller filed the lawsuit, she had paid the Rowes nearly $26,000.00 above the prescribed amount of the lease. The Rowes direct us to evidence that they had on several occasions contacted Miller regarding tardy payments of rentals, but the evidence also shows that Miller cured on each occasion by tendering payment—payments which were always accepted by the Rowes without further complaint. Although the Rowes also suggest that Miller had breached the lease agreement due to insurance cancellation notices issued by the insurer to Miller's business, it appears that the requisite insurance was reinstated in each instance with no failure of coverage. The mere issuance of such notices provides no support for their position. It is also apparent that even though ad valorem taxes were not always paid before delinquency, in each instance they were paid before there were any moves taken by taxing authorities to foreclose a tax lien.

6

In her testimony, Theresa testified at some length about failures of Miller to consistently make payments in a timely manner, indicating that at the time of trial, the payments on her own mortgage were behind schedule due to Miller's failure to continue to pay after this dispute arose. However, she also acknowledged that for forty-eight months she had been overpaid and that she had used that overpayment for her living expenses. (At the rate Miller was prepaying, the evidence indicates she would have satisfied the purchase price in ten years.) Theresa also acknowledged that until the problems with the March 2011 tax payment arose, she considered Miller (and Dorman) to be the purchasers of the building, and after she gave them a letter that month, she considered that the relationship had been transformed from seller and purchaser to landlord and tenant. At that point, she delivered a letter to Miller and Dorman which, according to Theresa's trial testimony, contained a misstatement. It reads, "[W]e were told that the total tax payment, as we required, had been paid." She testified that she meant that the ad valorem taxes had not been paid. She testified that as a result, she informed Miller that she was in breach, terminated the lease, and was of the opinion that on that date, Miller was only a renter. The letter is dated February 17, 2011. However, Miller paid the ad valorem taxes on March 4, within fifteen days after receiving notice from the Rowes that the taxes had not been paid.

This situation is further complicated by an additional agreement made by the parties in which Miller agreed to pay the Rowes an additional $400.00 per month into escrow for the purpose of setting the money aside for the payment of the ad valorem taxes (this payment being in addition to the $418.34 being paid each month in excess of the lease amount). The Rowes neither set up a formal escrow account, nor paid the ad valorem taxes from such money.

7

The trial court rendered a rather lengthy judgment, which contains a number of findings of fact and conclusions of law.  In short, it found that under these facts and the payments as actually made, Miller was not in violation or default on payments, late-paid taxes, or on any other basis and had validly exercised her option to purchase.  Applying those findings, the court ordered the Rowes as lessors/sellers to comply with the purchase agreement.

**Argument as Set Out by Rowe**

The Rowes argue in a single issue that Miller failed to provide evidence showing that she was entitled to enforce the judgment. They argue that the evidence conclusively shows that Miller did not strictly comply with the terms, and thus the findings that she was not in default were erroneously entered.

**Standard of Review**

In a legal sufficiency review, we view the evidence in a light favorable to the findings of the trier of fact, crediting favorable evidence if a reasonable fact-finder could, and disregarding contrary evidence unless a reasonable fact-finder could not.  *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).  When reviewing the factual sufficiency of the evidence, we examine all the evidence and set aside a finding only if it is so contrary to the evidence as to be clearly wrong and unjust.  *Bledsoe Dodge*, *L.L.C. v. Kuberski*, 279 S.W.3d 839, 841–42 (Tex. App.—Dallas 2009, no pet.); *Cameron v. Cameron*, 158 S.W.3d 680, 683 (Tex. App.—Dallas 2005, pet. denied).[4]

---

[4]Because findings of fact in a bench trial have the same force and dignity as a jury verdict, we review them for legal and factual sufficiency of the evidence under the same standards we apply in reviewing a jury's findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994).

**Application**

We have set out above a substantial portion of the evidence that is relevant to this determination. It is clear that Miller, in fact, had breached the contract because of the late payments, and arguably at other points because of her failure to timely pay ad valorem taxes she was required under the agreement to pay. Although there is evidence that she was not in absolute compliance at all times with all relevant regulations governing the operation of the business she conducted, the evidence shows nothing except that Miller's shortcomings in her performance were apparently corrected or ameliorated sufficiently to satisfy regulators; the child daycare business she conducted on the premises was never fined or shut down by the authorities due to uncorrected errors. The suggestion that she was somehow breaking the law with those failures is not one that is explained by counsel in a way that shows an uncorrectable, unwaivable breach of contract actually occurred. The letters indicating that insurance coverage had lapsed on various occasions was in each instance followed by acknowledgement by the insurer that the insurance was reinstated and that insurance coverage was fully provided.

In their argument, the Rowes take the position that the evidence shows that after several years of accepting late payments, they finally and properly decided to declare the contract terminated based upon Miller's failure to timely pay ad valorem taxes assessed against the property. The Rowes argue that this failure amounts to a material breach of the lease purchase agreement, occasioning a right on their part to terminate the agreement. However, under the terms of the contract itself, the lessee is permitted fifteen days from notification by the lessor of breach to remedy the breach. There is evidence that Miller did satisfy the taxes within that time

9

period from funds over and above the $400.00 per month that Miller had been delivering to the Rowes for the purpose of paying the taxes.

Rowe also argues, by reference to this Court's opinion in *Besteman v. Pitcock*, 272 S.W.3d 777, 784 (Tex. App.—Texarkana 2008, no pet.), that strict compliance (by Miller) was required and that her prior breaches showed her failure to comply with the terms of the lease/option agreement; thus, it was unenforceable. However, in *Besteman*, the problem was a failure to provide notice of the intent to exercise the option. That is not this situation. The analysis does not mean that every aspect of the underlying contract must be in every instance perfectly performed. The cases underlying our opinion in *Besteman* operate from the foundational principle that the termination of an optionee's right to purchase is not an action to be taken in an inflexible manner. *See Jones v. Gibbs*, 130 S.W.2d 265, 271–73 (Tex. Comm'n App. 1939, judgm't adopted).[5] Appellant does not argue in this case that the option was improperly or untimely exercised (except as discussed in the next paragraph), thus the authorities are not apposite.

The Rowes also argue that the court's finding that Miller gave written notice of intent to exercise the option is unsupported by the evidence. His argument, however, assumes that a copy of the written notice must appear in the record. Although that might be preferable, there is no authority holding such evidence indispensible. There is explicit and uncontroverted testimony from Dorman that on Miller's behalf, she gave the Rowes written notice of intent to exercise the

---

[5]In general, options to purchase property must be exercised in strict compliance with the terms of the option agreement. *Zeidman v. Davis*, 342 S.W.2d 555, 558 (Tex. 1961); *Probus Props. v. Kirby*, 200 S.W.3d 258, 262 (Tex. App.—Dallas 2006, pet. denied).

10

option to purchase on March 24. We reiterate that this notice of intent was given four days before the evidence shows that Miller received a letter stating the lease had been terminated. The Rowes argue that Dorman's testimony about the transmission of the written notice is insufficient evidence as a matter of law to support a finding that such a written notice was actually sent. We have reviewed the cases cited by the Rowes, and they do not suggest such a result; to conclude that oral testimony has no value is not consistent with a standard evidentiary analysis.

The Rowes also argue that the trial court improperly modified an unambiguous lease by giving credence to Miller's testimony that she had overpaid rent. There is no explanation of why this evidence constitutes a modification of the lease, and it is not apparent that it does so. Rather, this appears more to be evidence of the way in which the payments under the lease were made by Miller and accepted by the Rowes.

Finally, the Rowes argue that the evidence is legally and factually insufficient to support the trial court's findings that Miller was not in default under the lease agreement. The evidence, as set out above, shows that she did commit acts of default, but in each such event, Miller cured each such act of default as allowed by the lease. The contract provides specific penalties for the stated failures. The Rowes did not seek to recover those penalties, and the record does not contain evidence that they sent the written notice required by the lease except as noted above. Finally, the Rowes continued in each instance to accept Miller's payments and then each succeeding payment, thereby acknowledging that the default had been cured. There is legally

11

and factually sufficient evidence to support the findings of the trial court that have been attacked on appeal.

We affirm the judgment of the trial court.


Bailey C. Moseley
Justice

Date Submitted:    September 17, 2012
Date Decided:      October 18, 2012