**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
May 13, 2009

Charles R. Fulbruge III
Clerk

No. 07-41057

In the Matter of: ELDERCARE PROPERTIES LTD

Debtor

--------------------------------------------------------------

VALLEY EDUCATIONAL FOUNDATION, INC

Appellant

v.

ELDERCARE PROPERTIES LTD

Appellee

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Cons. W/ 08-40244

In the Matter of: ELDERCARE PROPERTIES LTD

Debtor

--------------------------------------------------------------

ELDERCARE PROPERTIES LTD

Appellant

v.

VALLEY EDUCATIONAL FOUNDATION, INC

Appellee

No. 08-40244 Cons. w/ 07-41057

Appeals from the United States District Court
for the Southern District of Texas

Before O'CONNOR, Associate Justice (Ret.),[*] and WIENER and STEWART,
Circuit Judges.

SANDRA DAY O'CONNOR, Associate Justice (Retired):

These consolidated appeals concern the vitality of the lease of a nursing home facility, Valley Grand Manor. The lessor, Valley Educational Foundation ("VEF"), argues that it validly terminated the lease in June 2005, before the lease's primary term expired. It also argues that if the lease survived the attempted termination, the lessee, ElderCare Properties Ltd. ("ElderCare"), failed effectively to exercise its option to renew the lease for an additional five-year term and that the lease consequently expired in December 2006. ElderCare argues that VEF never effectively terminated the lease. As to its failure strictly to comply with the lease's renewal terms, ElderCare contends that Texas common law principles of equitable intervention render its renewal effective.

The dispute has unfolded in the course of ElderCare's Chapter 11 bankruptcy. The issue whether the lease was validly terminated arose when ElderCare's bankruptcy estate moved to assume the lease in order to reorganize for the sole purpose of continuing to operate the nursing home. The United States Bankruptcy Court for the Southern District of Texas sided with ElderCare and allowed it to assume the lease, concluding that the lease had not been terminated. The court also ordered the parties to mediate certain ongoing lease terms. While the mediation process unfolded, ElderCare failed to provide

---

[*] The Honorable Sandra Day O'Connor, Associate Justice of the United States Supreme Court, (Ret.), sitting by designation, pursuant to 28 U.S.C. § 294(a).

timely notice of its intent to renew the lease, and VEF later sought to evict ElderCare, arguing that the lease had expired while the parties were pursuing mediation. Again the Bankruptcy Court sided with ElderCare, invoking Texas common law principles of equitable intervention to excuse ElderCare's technical omission. The United States District Court for the Southern District of Texas affirmed the former conclusion, but reversed the latter. It held: (I) the lease was not terminated in June 2005 and was thus properly assumed; and (ii) Texas principles of equity could not excuse ElderCare's failure to provide timely notice and as a result the lease expired in December 2006.

We agree with the Bankruptcy Court on both questions. We conclude that VEF failed to terminate the lease and that the lease was properly assumed by ElderCare's bankruptcy estate. We further conclude that principles of equitable intervention under Texas law are properly applied in the unique circumstances of this case in order to render effective ElderCare's five-year renewal.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY[1]

### A. Background.

VEF is a non-profit organization owned by the Seventh Day Adventist Church. When it ran into difficulty operating two nursing homes and a retirement facility that it owned, it asked Glen Hamel, a member of the Church and the owner of ElderCare, to join VEF's board and to offer help. With Hamel's assistance, VEF sold one of the nursing homes and the retirement facility. This dispute involves the remaining nursing home, Valley Grand Manor. Under a management contract, ElderCare took control of that facility's operations. In 1995, the parties went a step farther, consummating a lease of the facility to

---

[1] We set forth the facts as found by the Bankruptcy Court in its October 12, 2006, and April 23, 2007, decisions. The former decision is reported at 2006 WL 4125090 and will be cited as "Assumption Order, p.__, ¶__." The latter is reported at 2007 WL 1217891 and will be cited as "Renewal Order, p.__."

ElderCare. In light of the church's policy that its members should not litigate against one another, the lease agreement included several uncommon provisions requiring good faith negotiations and mediation in certain contexts.

### 1. Maintenance of minimum insurance coverage.

In two provisions, the lease obliged ElderCare to maintain minimum insurance coverage. Section 6.07 set minimum coverage levels for "claims for personal injury or property damage under a policy of general public liability insurance." Section 6.08 did so for "claims arising out of malpractice." Section 6.16 of the lease also provided for renegotiation of the coverage minimums as follows:

> In the event that either party shall at any time deem the limits of the *personal injury or property damage public liability* insurance then carried to be either excessive or insufficient, the parties shall endeavor to agree on the proper and reasonable limits for such insurance . . . . If the parties shall be unable to agree thereon, the proper and reasonable limits for such insurance to be carried shall be determined by a mediator jointly selected . . ., provided however that the terms of the underlying Base Lease shall control the minimum insurance requirements which [Eldercare] is required to provide hereunder.

### 2. Renegotiation of rent terms.

Because the nursing home derived a substantial portion of its revenue from Medicare/Medicaid reimbursements (more than 85% before 1995), the parties, in sections 2.07 and 14.09 of the lease, provided for the renegotiation of the rent terms in the event of substantial changes in those programs:

> [VEF] recognizes that the primary source of revenue for the Facility is derived from residents from whom the payer source is either Medicaid or Medicare. Thus, should there be substantive changes and/or reductions in the way that Medicaid or Medicare and/or their successor programs reimburse the Facility for providing care, [VEF] at [Eldercare]'s request will enter into good faith negotiations with respect to the amount of Basic Rent and/or Additional

4

Rent that is due and payable under the terms of this Lease Agreement.

. . . .

[VEF and Eldercare] agree that should there be significant changes in the Medicare and/or Medicaid reimbursement methodology, [they] will proceed in good faith to amend the terms of this Agreement in a manner that represents a reasonable accommodation of the interests of each party.

### 3. Default by ElderCare and VEF's right to terminate.

Article 13 of the lease addressed default and termination. Section 13.01(b) provided that it would be "deemed [an] even[t] of default" by ElderCare if ElderCare "fail[ed] to comply with any term, provision, or covenant of th[e] Lease . . . and d[id] not cure the failure within thirty (30) days after written notice." Section 13.02(a) gave VEF the option to terminate the lease upon the occurrence of any default.

### 4. Term of the Lease.

Article 1 of the lease set December 31, 2006, as the lease's expiration date. It also granted ElderCare an option to extend the lease for an additional five-year term. In order to exercise that option, ElderCare was obliged to provide VEF written "notice of its intention to do so not later than 30 days prior to the expiration of the Lease term," on or before December 1, 2006.

## B. VEF's appeal.

### 1. ElderCare's failure to maintain the minimum insurance coverage and VEF's purported termination of the lease.

In 1999, medical malpractice rates for Texas nursing homes started to climb dramatically. The business landscape was further complicated by a series of major changes to Texas's Medicare/Medicaid program that began in 2000. That year, ElderCare made several presentations to the VEF Board to explain these program changes and their purportedly adverse implications for ElderCare's business. The parties subsequently had several discussions on this issue. In August 2000, ElderCare sought to initiate a renegotiation of the rent

terms pursuant to §§2.07 and 14.09 of the lease, first at a meeting and then in writing. VEF responded with a demand that ElderCare agree to a host of substantive changes to the lease (beyond the scope of rent terms) before VEF would commence renegotiations. VEF's preconditional amendments were memorialized in a VEF Board resolution and a letter to ElderCare. ElderCare refused to agree to the amendments, and a stalemate ensued.

Facing mounting rates, at the end of 2000 ElderCare reduced its insurance coverage below the lease minimums. VEF did not object to ElderCare's coverage levels for policy years 2001, 2002, or 2003. In 2003, ElderCare was unable to obtain malpractice insurance. To shield itself from liability, it subleased Valley Grand Manor to a newly-created corporation. The arrangement mirrored one VEF had used before leasing the facility to ElderCare. With this sublease in place, ElderCare terminated its general liability coverage, believing it no longer faced general liability. ElderCare never sought VEF's consent and VEF never objected to the sublease arrangement. From 2003 to 2005, while the sublease was in effect, more than 50% of nursing homes in Texas carried no malpractice coverage.

In the summer of 2004, ElderCare made a series of presentations to VEF's board and the parties held several other meetings. ElderCare endeavored to explain its difficulty securing insurance coverage and sought to renegotiate the lease minimums. VEF refused to negotiate to this end and notified ElderCare of its position that ElderCare was in default. Nevertheless, the parties continued to discuss the issue; VEF made no effort to terminate the lease and it extended the time for ElderCare to comply. At these meetings, ElderCare also raised again the challenges it faced in light of the changes being made to the Texas Medicare/Medicaid program. ElderCare sought renegotiation of the rent and retroactive adjustments for overpayment without success. Again VEF insisted upon extensive amendments to the lease as a precondition to

renegotiation and again the issue went nowhere.

On January 3, 2005, ElderCare notified VEF of its below-minimum general liability coverage and it failed to furnish proof of malpractice coverage for 2005. VEF sent a purported notice of default on January 11, 2005 ("January 11 letter"). In pertinent part, the letter stated:

> We received the [information you] sent to us on January 3, 2005. Thank you for responding by the deadline, but we have several concerns about it. The amount of coverage for the general liability does not meet the requirements of the lease and there was not any coverage for medical malpractice insurance that is also required by the lease. These are defaults according to the lease. If you want to ask the board for a possible reconsideration of the lease insurance requirements, ElderCare, Inc. will need to submit letters of denial of coverage and copies of quotes on insurance that make it cost prohibitive, on or before January 21, 2005. The Valley Educational Board will consider information you supply and then will give you a response. ElderCare, Inc. will need to respond to this letter by [blank].

ElderCare responded orally and by scheduling a meeting, which took place on January 19. At the meeting, Hamel and Errol Eder, VEF's Vice President, discussed an extension of the time in which ElderCare could respond with more information and the possibility of a renegotiation of the insurance minimums. ElderCare later sent to VEF emails memorializing its understanding that it had been granted additional time to respond. VEF did not dispute ElderCare's characterization of the meeting. Subsequent communications supported ElderCare's understanding that it faced no immediate deadline by which to secure insurance coverage.

On March 1, ElderCare provided an extensive report to VEF's lawyer, which it understood to satisfy the informational requirement of the January 11 letter. VEF's Board never received the report, and ElderCare never received a response.

In May, VEF's Board voted to terminate the lease. On June 10, VEF sent ElderCare a purported termination letter, which identified ElderCare's failure to secure malpractice insurance as the triggering breach. ElderCare continued to search for insurance and obtained a new (below-minimum) malpractice policy on June 25.

VEF brought a forcible entry action in county court, and a jury returned a verdict in its favor. On October 25, while that judgment was on appeal, ElderCare filed a Chapter 11 bankruptcy petition.

## 2. Bankruptcy Court proceedings.

Once ElderCare entered bankruptcy, VEF filed a claim against the bankruptcy estate seeking damages resulting from ElderCare's purported breach of the lease's minimum insurance coverage provisions. ElderCare (as debtor in possession) countered with a motion to assume the lease in bankruptcy under 11 U.S.C. §365 and with objections to VEF's claim, demanding offsets and recoupment in light of VEF's alleged breach of its obligations to renegotiate the rent and coverage limits. VEF opposed the motion to assume, arguing that the lease was validly terminated on June 10 and thus not assumable. The Bankruptcy Court held a three-day trial, during which more than 10 witnesses testified and dozens of exhibits were introduced.

(a) The Bankruptcy Court granted ElderCare's motion to assume the lease. It held that VEF failed effectively to terminate the lease for three reasons.

First, the court concluded that after sending the January 11 letter, VEF agreed to an indefinite extension of time for ElderCare to respond, and it never revoked that agreement. The court found that at the January 19 meeting, "Mr. Hamel and Mr. Eder discussed ElderCare's request for more time and to deal with and document the changing insurance market and as well as changing the insurance requirements under the Lease" and that "Errol Eder on behalf of VEF

agreed to indefinitely extend the deadline for ElderCare to obtain malpractice insurance." The court further found that this grant of an indefinite extension was confirmed by the subsequent email exchanges between the parties and by ElderCare's ongoing efforts to provide the requested information, without objection or clarification from VEF. "VEF did not respond to [ElderCare]," the court found, "but allowed ElderCare to continue to believe that VEF was working with them on the insurance issue which is what ElderCare continued to believe."

Second, the court held that VEF's January 11 letter "was not sufficient under Texas common law to trigger [VEF's] right to terminate the Lease with ElderCare." The court based this conclusion on its finding that the January 11 letter "did not make a demand for performance upon ElderCare" and "did not inform ElderCare that the Lease [could] be terminated unless [ElderCare] took action to obtain insurance as called for by the Lease."

Lastly, the Bankruptcy Court concluded that VEF's conduct excused ElderCare's failure to perform its minimum insurance coverage obligations. The court held that VEF breached its obligation under §6.16 to negotiate (and potentially mediate) a reduction in the malpractice insurance limits for policy year 2004–2005. The court further held that this breach excused ElderCare's failure to secure malpractice coverage in policy years 2004 and 2005. Similarly, the court held that VEF's failure to object to ElderCare's coverage levels in policy years 2000, 2001, 2002, and 2003 constituted a waiver of any breach by ElderCare in those years.

The court also concluded that ElderCare satisfied §365's conditions for assumption. *See* 11 U.S.C. §365(b)(1) ("If there has been a default," the lease cannot be assumed unless the debtor: (a) "cures, or provides adequate assurance that the trustee will promptly cure, such default;" (b) "compensates, or provides adequate assurance that [it] will promptly compensate, . . . for any actual pecuniary loss;" and (c) "provides adequate assurance of future performance.").

(b) The court dispensed with VEF's bankruptcy claim and ElderCare's objections and demand for set-off by concluding that "[b]oth ElderCare and VEF breached the Lease, but failed to prove damages or at best [were] entitled only to nominal damages for their mutual breaches."

### 3. District Court proceedings.

In a brief, oral ruling, the District Court adopted the reasoning of the Bankruptcy Court and affirmed its judgment.

## C. ElderCare's appeal.

### 1. The negotiation of the terms of the court-ordered mediation and ElderCare's failure to provide timely notice of its intent to renew the lease.

The Bankruptcy Court's October 12, 2006, opinion also held that ElderCare had a right to mediate new insurance coverage minimums with VEF. To that end, the court's November 16 judgment "ORDERED that ElderCare and VEF [were] to promptly arrange and participate in this mediation." The judgment also referenced a plan of reorganization that contemplated ElderCare's continued operation of the Valley Grand Manor nursing home pursuant to its lease with VEF. Six days after the Bankruptcy Court issued its opinion, on October 18, ElderCare wrote to VEF. The letter proposed new insurance coverage minimums and, in the event they were unacceptable to VEF, requested mediation and proposed a mediator.

Despite ElderCare's diligence, the process did not proceed smoothly. VEF responded over a month later, on December 5. It asserted that the appointment of ElderCare's suggested mediator "would not be appropriate," but did not propose an alternative candidate. In other respects, VEF's response fell short of willing cooperation. For example, VEF insisted that there was "[a] need to develop procedures which would allow discovery and other traditional litigation

steps to be implemented as a predicate to the [mediation]." And VEF required ElderCare to provide extensive information before VEF would even discuss the procedures and timetable for mediation. Three days after it received this response, ElderCare indicated that it would file an emergency motion to compel mediation and for sanctions if VEF continued not to cooperate.

In the following days, extensive negotiations proceeded unsuccessfully. VEF capitulated to a discussion of the substance of a mediation plan, dropping its demand for the development of "procedures which would allow discovery and other traditional litigation steps" and for the provision by ElderCare of extensive information. However, VEF's proposed mediation terms were aggressive at best. For example, VEF proposed to empower the mediator to revisit certain of the Bankruptcy Court's critical factual findings and legal conclusions. And it sought to delay the implementation of mediated coverage minimums until the resolution of its appeal of the court's assumption decision. ElderCare ultimately filed an emergency motion to compel mediation, as promised. The bankruptcy court set that motion for hearing on December 19. On December 18, the day before that hearing was to occur, VEF agreed to the process for mediation and ElderCare withdrew its motion. Under the terms of that agreement, the mediation was to take place on February 21, 2007.

That plan was short lived. Just over two weeks after the agreement was reached, on January 3, 2007, VEF informed ElderCare that the lease had expired on January 1 because ElderCare had failed to provide written notice of its intent to renew by December 1, 2006, as required by the lease. VEF then filed a motion to compel ElderCare to vacate the premises.

## 2. Bankruptcy Court proceedings.

The Bankruptcy Court denied VEF's motion. It construed Texas law to provide for equitable intervention to excuse a technical failure in the exercise of an option "when the delay in fulfilling [the] condition precedent in a lease has

been slight, the loss to the lessor small, and the failure to grant the relief to the lessee would resul[t in] such hardship as to make it unconscionable to enforce literally the condition precedent of the lease." Renewal Order, p. 2 (citing *Jones v. Gibbs*, 130 S.W.2d 265, 271 (Tex. 1939)). The court concluded that all three factors were met, and it intervened to excuse ElderCare's technical omission under this equitable doctrine.

Reviewing the evidence presented, the court found that "[a]lthough it was not sent written notification . . ., VEF was notified on many occasions of [ElderCare]'s intent to exercise its option to extend the Lease," and it found nothing that "indicated that VEF considered the Lease terminated or that it did not believe [ElderCare] intended to exercise its option to renew the Lease." In reaching this conclusion, the court noted that it had "ordered the Debtor and VEF to enter into binding mediation for insurance rates and to renegotiate the Lease rate." And it stressed that the "[n]egotiations between [ElderCare] and VEF regarding the terms and conditions of mediation, discovery disputes, and related procedures continued past" the renewal notice deadline. During these negotiations, "VEF insisted on terms, provisions, and procedures for mediation and rent renegotiation without ever mentioning that VEF considered the Lease terminated;" VEF's "communications, agreements, court pleadings, [and] representations to the Court" failed "[to] indicat[e] that VEF considered the Lease terminated or that it did not believe [ElderCare] intended to exercise its option to renew the Lease." In particular, VEF entered into an agreement to mediate the insurance issue 18 days after the deadline for renewal notice had passed, scheduling the mediation to take place approximately six weeks after the renewal term was to commence.

The court held that the delay in providing renewal notice was slight because ElderCare "gave written notice immediately (one day) after discovering the oversight and the delay was only 33 days after the deadline" — that is,

Eldercare gave written notice 33 days after the December 1 renewal deadline and a mere three days after the lease's December 31 expiration. It also found that VEF "failed to demonstrate that it [would] be harmed by allowing equity to intervene." "VEF's loss [was] small, considering it was actively negotiating terms of the Lease, pursuing its appeal of the Court's prior order allowing assumption of the Lease, and behaving in every aspect as if it knew that [ElderCare] intended to exercise the extension."

Lastly, the court held that "[f]ailure to extend the Lease . . . [would] creat[e] such a hardship to [ElderCare] that it [would be] unconscionable to enforce the term literally." ElderCare "invested over $300,000 in fees and costs alone in proving that VEF did not terminate the Lease pre-petition." This effort was "for the sole purpose of assuming the Lease and reorganizing the business which necessarily depended on the option being exercised and the Lease extended" because the lease was "the only basis" for ElderCare's "continu[ation] as a viable business." In short, the court explained that "[t]he entire chapter 11 case . . . involved and required preservation of the Lease option period."

Weighing the equities, the court reasoned that "[a]t best . . . VEF asserted its termination argument only after it realized there was no written notice sent to it." And "[a]t worst, VEF laid behind the log in this case, continuing to negotiate with [ElderCare] regarding Lease terms and appearing in Court, all the while not pointing out that the Lease was terminated under its theory." Under these circumstances, the court concluded that equitable intervention was warranted.

Remarking that "what's sauce for the goose is sauce for the gander," the Bankruptcy Court also found that "the notice provision of the Lease [was] incapable of performance because it require[d] notice to be sent to an address not [provided]." Finally, as a third basis for denying VEF's motion, the court held that it could order the cure of ElderCare's failure to provide renewal notice

pursuant to its authority to enforce its automatic bankruptcy stay.

### 3. District Court proceedings.

On appeal, the District Court reversed the judgment of the Bankruptcy Court. Its opinion was rendered in a brief, telephonic hearing. As a result, the court's reasoning is less than clear. The court "[did not] think that [it] as a Court [could] . . . rewrite the lease under equitable principles." And it held that "the equitable principles here d[id] not, as a matter of law, allow . . . [the court to] excuse the non-compliance of a very important part of th[e] lease agreement, which was the renewal notice." The court "assume[d] these [were] conclusions of law;" it did not call into question any of the Bankruptcy Court's factual findings.

## II. DISCUSSION

We have jurisdiction to consider these appeals under 28 U.S.C. §158(d). We apply the same standards of review to the Bankruptcy Court's findings of fact and conclusions of law as applied by the District Court. *Nesco Acceptance Corp. v. Jay (In re Jay)*, 432 F.3d 323, 325 (5th Cir. 2005). Accordingly, we review the Bankruptcy Court's findings of fact for clear error and its conclusions of law *de novo. Id.* Clear error review is "especially rigorous" when we review a lower court's assessment of trial testimony, "because the trier of fact has seen and judged the witnesses." *United States v. Casteneda*, 951 F.2d 44, 48 (5th Cir. 1992). "[I]n bankruptcy proceedings, courts of appeals look to state law to decide contract issues." *River Prod. Co. v. Webb (In re Topco, Inc.)*, 894 F.2d 727, 738 (5th Cir. 1990); *see also Butner v. United States*, 440 U.S. 48, 55 (1979).

## A. VEF's appeal.

VEF challenges the Bankruptcy Court's grant of ElderCare's motion to assume the lease, arguing that the lease was effectively terminated and thus not assumable. VEF also argues that the Bankruptcy Court exceeded its authority by foreclosing VEF's right to assert in the future claims it was not obliged to join

in the underlying bankruptcy litigation. We reject both arguments.

## 1. ElderCare's assumption of the lease.

Under 11 U.S.C. §365(a), a debtor in bankruptcy, "subject to the court's approval, may assume . . . any executory contract or unexpired lease." However, the debtor may not assume a lease if it "is of nonresidential real property *and has been terminated under applicable nonbankruptcy law prior to [bankruptcy]*." §365(c)(3) (emphasis added). As VEF's brief recognizes, "[t]he cardinal issue in this matter has always been whether the Lease was terminated prior to ElderCare's petition for bankruptcy." The Bankruptcy Court concluded that VEF failed effectively to terminate the lease for three reasons: First, it concluded that after the January 11 letter, VEF agreed to an indefinite extension of time for ElderCare to respond, and VEF never revoked that agreement. Second, the Bankruptcy Court held that the January 11 letter was insufficient under Texas common law to provide notice of termination. Third, the court held that ElderCare's failure to perform its insurance coverage obligations was excused by VEF's breach of its promise to renegotiate the coverage minimums in good faith. We affirm on the first basis, and we thus do not reach the other two.

As the Bankruptcy Court stressed, the January 11 letter set forth the information ElderCare would need to provide in order "to ask [VEF] for a possible reconsideration of the lease insurance requirements." The letter further provided that VEF "w[ould] consider [the] information . . . suppl[ied] and then w[ould] give [ElderCare] a response." In response to this letter, Hamel promptly scheduled a meeting with Eder, which took place on January 19. Having heard testimony from both Hamel and Eder, the Bankruptcy Court found that at their meeting they "discussed ElderCare's request for more time . . . to deal with and document the changing insurance market and as well as changing the insurance requirements under the Lease." And "Eder on behalf of VEF agreed to indefinitely extend the deadline for ElderCare to obtain malpractice insurance."

15

In support of this finding, the Bankruptcy Court discussed Hamel's follow-up shortly after the meeting and VEF's response. On January 27, Hamel sent Eder an email that stated:

> It was a pleasure having lunch with you last Wednesday.
>
> As we discussed there has been a sea of changes in the malpractice/professional liability insurance markets over the last few years. As I promised at our meeting, I have asked our insurance carrier to provide an outline of these changes and how it has effected Valley Grande Manor. Also, I am seeking a way by which Valley Grande Manor can procure professional liability in accordance to the spirit of the lease between VEF and VGM.
>
> You indicated a willingness to allow some additional time to accomplish this beyond the date noted in the letter from John Page which was dated January 11, 2005. I would anticipate being back in touch with you regarding this matter no later than mid next week and would probably like to schedule a brief meeting with you at that time.
>
> Thank you for the meeting and I appreciate the spirit of cooperation that was exhibited in our discussions.

Eder responded to the email, "thanx for the update." Neither "[he], nor anyone from VEF, responded . . . with any objection, clarification, or denial, as to the contents of the email or provide[d] any notice that the Lease would terminate in approximately 20 days." Assumption Order, p.18, ¶ 125. On February 2, ElderCare again wrote Mr. Eder at VEF that "our insurance broker is working diligently on our professional liability coverage." Eder again responded "Thanx for the update," and he promised to forward the correspondence to John Page, the author of the January 11 letter.

The Bankruptcy Court also stressed that Hamel began to provide the information requested. In March he "provided Mr. Eder with the reports on progress in obtaining information by furnishing copies of two letters that he received from his insurance agents reflecting the work his agents were doing in

attempting to find professional liability coverage." *Id.* p.19, ¶ 130. The letters Hamel provided "documented over a dozen insurance companies that were being contacted to provide the malpractice insurance and contained the information that ElderCare understood was to be furnished to VEF during this search period. *Id.* p.19, ¶ 131. In June Hamel continued to furnish information about Medicaid reimbursement problems. The Bankruptcy Court found that "no 'response' was ever given by VEF to the information and communications of ElderCare to VEF concerning insurance and no notice was given that the agreed 'extension' of time to communicate and 'negotiate' had expired." *Id.* 20, ¶ 137.

In sum, the Bankruptcy Court found: With its January letter, VEF explicitly invited ElderCare to pursue renegotiation and to provide information to that end. VEF also agreed to respond to the information provided. In response, ElderCare promptly arranged a meeting, during which VEF agreed indefinitely to extend the time for ElderCare to provide the requisite information. ElderCare "actively and diligently," *id.* p.17, ¶ 119, worked to secure the necessary information, and it provided information as it was obtained. ElderCare's communications reflected the parties' agreement indefinitely to extend any deadlines, and VEF never made any objections or suggestions to the contrary. VEF also failed to provide the promised response to the information submitted by ElderCare.

These factual findings amply support the Bankruptcy Court's conclusion that VEF indefinitely extended the time for ElderCare to respond to VEF's January letter and that VEF did not revoke that extension before purporting to terminate the lease five months after it sent the January 11 letter. That conclusion, in turn, is fatal to VEF's contention that it effectively terminated the lease before ElderCare entered bankruptcy. *E.g., Smith v. Hues*, 540 S.W.2d 485, 488 (Tex. Civ. App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.) ("[E]ven

where time is of the essence, [a] stipulated time limit may be extended . . . by agreement[.]").

We are not persuaded by VEF's contention that the Bankruptcy Court's factual findings were clearly erroneous. VEF makes two arguments to this effect. First, it argues that "there was no evidence at the Trial that VEF *ever* agreed to indefinitely extend the deadline for ElderCare to obtain malpractice insurance." This argument is at best without merit. It ignores the entirety of the Bankruptcy Court's analysis. As described above, the Bankruptcy Court explicitly referenced testimony and exhibits that directly supported its factual findings.

Second, VEF argues that "[ElderCare] admit[ted] that no indefinite extension was granted." VEF premises this purported concession on short excerpts of Hamel's trial testimony and his January 27 email. VEF cites the following exchange during Hamel's testimony:

> Q: [D]id you discuss whether or not the deadline in the January 11 letter was important to Mr. Eder to enforce, or anything to that effect?
> A: I don't believe it was discussed in those terms, but I—
> Q: How was it discussed?
> A: I indicated that I would like to sit down, where we had the decision makers present, get whatever documents we need, that they need, the financial information. He asked me, "Will you bring your financial information?" I said, "Yes." I said, "Let's schedule a meeting and get this taken care of." And as we left the meeting, I remember shaking his hand, and said, "Errol, you know my number. Give me a call. Let's get a meeting set up."
> Q: Now, with respect to the time within which to do this, what was the agreement that was reached?
> A: There was no specific time.
> Q: All right. Was it some sort of open-ended—
> A: **I did not believe it was open-ended**. It was my hope and impression that this would happen sooner rather than later. (emphasis in brief).

18

As to the January 27 email, VEF harps on Hamel's statement that he "would anticipate being back in touch . . . regarding th[e] matter no later than mid next week and would probably like to schedule a brief meeting . . . at that time."

VEF's reliance on these excerpts is misplaced. We think the trial testimony undermines its position. It reflects that Hamel and Eder did not "discuss whether or not the deadline in the January 11 letter was important to Mr. Eder to enforce, or anything to that effect." To the contrary, the parties discussed that Hamel would "[g]et whatever documents . . . they need[ed]" and then they would "schedule a meeting and get [the issue] taken care of." Despite this testimony, VEF understands Hamel's statements that he "did not believe [the extension of time] was open-ended" and that it was his "hope and impression that this would happen sooner rather than later," as a concession that there was no agreement to extend discussions. This understanding strains credulity. It is clear that Hamel meant only to acknowledge that VEF's willingness to continue discussions would expire at some point and his related hope that the matter would be resolved expeditiously, in the "spirit of cooperation." He recognized that the extension was not "open-ended," but did not suggest that a deadline was ever established. This is consistent with the Bankruptcy Court's finding that the parties agreed indefinitely to extend ElderCare's deadline, especially when the testimony is considered in light of the substantial evidence described above. Certainly, we cannot conclude that the Bankruptcy Court clearly erred by declining to adopt VEF's understanding of Hamel's testimony.

The excerpt from Hamel's January 27 email is similarly unavailing. Hamel wrote that he "anticipate[d] being back in touch . . . regarding this matter no later than" a week after sending the email. VEF insists that this anticipation amounted to a concession that there was no indefinite extension of time. We fail to see how Hamel's estimation of the time required to compile certain

information could reflect a belief that he would not be accorded that time. And we find significantly more illuminating the facts that Hamel corrected his optimistic anticipation by writing to Eder within a week to inform Eder that Hamel's team was "working diligently" to respond; that Eder did not object to Hamel's tardiness; and that Hamel ultimately provided the information approximately one month late. If anything, the parties' behavior, despite Hamel's anticipation, bolsters the Bankruptcy Court's conclusion that the parties agreed to an indefinite extension of time, especially when considered in light of the substantial evidence described above. We cannot conclude that the Bankruptcy Court clearly erred by declining to adopt VEF's understanding of Hamel's email.

We find no error in the Bankruptcy Court's conclusion that VEF granted ElderCare an indefinite extension of time in which to respond to VEF's January 11 letter and that VEF never revoked that extension. On this basis, we affirm the decision of the District Court sustaining the Bankruptcy Court's judgment of November 14, 2006, allowing ElderCare to assume the lease.

**2. The scope of the Bankruptcy Court's Judgment.**

VEF also challenges the scope of the Bankruptcy Court's judgment, arguing that it erroneously "prohibited VEF from bringing against ElderCare any permissive counterclaims or any unrelated claims it might have but which were not then before the Court." We find it difficult to conceive a claim VEF might assert in the future that would not qualify as a mandatory counterclaim "aris[ing] out of the transaction or occurrence that [was] the subject matter" before the Bankruptcy Court. FED. R. CIV. P. 13(a)(1)(a); *see, e.g., Incas & Monterey Printing & Packaging, Ltd. v. M/V SANG JIN,* 747 F.2d 958, 964 (5th Cir. 1984) ("Under the broad test for Rule 13(a) adopted by this Circuit, a counterclaim is compulsory when there is any 'logical relationship' between the claim and the counterclaim." (citation omitted)). Certainly, VEF fails to describe

such a claim. We thus consider VEF's argument largely theoretical.

Nonetheless, we reject it. VEF's construction of the judgment is flawed. The judgment provides: "All relief requested in the Motion or relief that could or should have been requested . . ., and not herein granted, is denied." We understand the phrase "relief that could or should have been requested" to refer to the relief related to the claims the parties actually asserted, as evidenced by the court's reference to "relief requested in the Motion." That is, the Bankruptcy Court did not deny relief stemming from *claims* that could have been *asserted*. Rather, it denied the *relief* that could have been *requested* in the dispute presented. Properly construed, the judgment reflects no error.

## B. ElderCare's appeal.

As described *supra*, the Bankruptcy Court concluded that ElderCare's failure strictly to comply with the renewal provisions of the lease should be excused under Texas common law principles of equitable intervention. The District Court reversed that judgment, concluding that equitable intervention is not available under Texas law. ElderCare challenges this conclusion. We hold that the District Court's legal determination was erroneous, and we agree with the Bankruptcy Court that equitable intervention is appropriate in this exceptional case.

### 1. Equitable intervention under Texas law.

Texas law generally gives effect to a party's exercise of an option only if the exercise is "unqualified, unambiguous, and strictly in accordance with the terms of agreement." *Atterbury v. Brison*, 871 S.W.2d 824, 829 (Tex. App.—Texarkana 1994, writ denied); *see Casa El Sol-Acapulco, S.A. v. Fontenot*, 919 S.W.2d 709, 714 (Tex. App.—Houston [14th Dist.] 1996, writ dism'd) ("[T]o extend the power [to exercise an option] for a day is to compel the giving of something for nothing." (citation omitted)); *see also Jones v. Gibbs*, 130 S.W.2d 265, 271 (Tex. 1939). There is no question that ElderCare failed to meet this exacting standard.

Because ElderCare did not provide timely notice of its intent to extend the lease, as required by the contract, it did not exercise its option "strictly in accordance with the terms of agreement."

However, in *Jones*, the Texas Supreme Court explained that the rule of strict compliance in the exercise of an option "is not an absolutely inflexible one" and it described the narrow circumstances in which the "failure of the optionee to comply strictly with the terms or conditions of the option will be excused." *Jones*, 130 S.W.2d at 272. *Jones* concerned the grant of a deed to Gibbs Brothers & Company to cut and remove pine timber on a parcel of land owned by Helen M. Jones. The deed was for ten years, with a five-year extension period at Gibbs Brothers & Company's option, exercisable by the company's payment of an additional fee. After the deed was executed, Jones obtained a loan from G. A. Wynne that was secured by the property. Under the terms of that loan, when Jones fell behind on her tax liability for the property, Wynne paid the taxes and accordingly adjusted the amount owed by Jones. Jones then died, and the property entered her probate estate. Later, in an effort to exercise its option to extend its timber deed, Gibbs Brothers & Company paid the required renewal fee directly to Wynne. Jones's estate subsequently sought to have the timber deed declared inoperative, arguing that Gibbs Brothers & Company failed strictly to comply with the deed's requirement that payment of the renewal fee be made directly to Jones or her heirs.

Rejecting that argument, the *Jones* court adopted the test set forth by the Connecticut Supreme Court in *F. B. Fountain Co. v. Stein*, 118 A. 47, 50 (Conn. 1922). Like this case, *F. B. Fountain Co.* concerned "a requirement of [a] lease that [the lessee] give notice thirty days before the expiration of the term of [its] desire to extend the lease." *Jones,* 130 S.W.2d at 272. The *F. B. Fountain Co.* court recognized that the notice requirement was "a condition precedent which [had to be] performed before the extended or renewed term could begin and held

that the lessee, not having given the notice within the stipulated time, had no right to relief unless it could establish . . . such facts as would bring it within the power of equity to relieve." *Id.* As the *Jones* court wrote:

> In prescribing the conditions for the granting of relief upon equitable grounds, the [*F. B. Fountain Co.*] court said in substance that, while relief cannot be afforded if the failure to give notice has been due to willful or gross neglect, equity will relieve, in the absence of such neglect, when the failure results from fraud, surprise, accident or mistake. It said further: *"In cases of mere neglect in fulfilling a condition precedent of a lease, which do not fall within accident or mistake, equity will relieve when [(1)] the delay has been slight, [(2)] the loss to the lessor small, and [(3)] when not to grant relief would result in such hardship to the tenant as to make it unconscionable to enforce literally the condition precedent of the lease."* *Id.* (quoting *F.B. Fountain Co.*, 118 A. at 50) (emphasis added).

*See also id.* (discussing with approval *Xanthakey v. Hayes*, 140 A. 808 (Conn. 1928), another case of equitable intervention to excuse the failure to provide notice of a lease extension, where "[t]he gist of the decision [was] that it would be unconscionable to enforce literally the condition for the extension when to do so would cause the lessee, who had not been grossly negligent, to lose the value of . . . improvements and the good will of [its] established business"). Applying the rule of *F. B. Fountain Co.* and similar precedents from other States, the *Jones* court concluded that "overruling equitable rules" excused Gibbs Brothers & Company's failure to adhere to the deed's strict requirements for extension. *Id.* at 273.

VEF presents a very different view of Texas common law. It advances two arguments, both of which we reject. First, VEF suggests that Texas law does not recognize any equitable exception to the requirement of strict compliance with the terms of an option contract. But our discussion of *Jones* makes clear that the contention is without merit: In certain circumstances, the "failure of the

optionee to comply strictly with the terms or conditions of the option will be excused." *Id.* at 272.

VEF's second argument is more nuanced and worthy of greater attention. Whatever the contours of equitable intervention under Texas law, VEF asserts, the State has not recognized an exception to the rule of strict compliance in cases of "mere neglect." *Id.* (quotation omitted). The discussion in *Jones* of the three-factor test for the intervention of equity in cases of mere neglect, VEF asserts, was dicta, and it has not been subsequently adopted. VEF relies on *Reynolds-Penland Co. v. Hexter & Lobello*, 567 S.W.2d 237 (Tex. Civ. App.—Dallas 1978, writ dism'd) for this contention. The *Reynolds-Penland* majority read *Jones* to conclude that Gibbs Brothers & Company's payment to Wynne was authorized by Jones's estate and that the payment consequently complied with the strict terms of the lease. On this reading, the majority characterized the three-factor equitable test in *Jones* for cases of mere neglect as "*dicta* [that] . . . was not essential to the decision." *Id.* at 240. In dissent, Chief Judge Guittard concluded that *Jones* "was expressly decided on the . . . ground of equitable relief from unconscionable hardship stated by the Connecticut court in [*F.B. Fountain Co.*]" *Id.* at 243 (Guittard, C.J., dissenting). He reasoned that "[a]lthough the [Jones] court said that the grantee had shown that he had not paid the wrong party, that [was] not the main ground on which the decision rest[ed]." *Id.*

We conclude that the dissent in *Reynolds-Penland* presented the better reading of *Jones*. The *Jones* court determined that resolution of the case did not require submission to a jury of the disputed question whether Gibbs Brothers & Company's payment to Wynne was authorized by Jones's estate. It explained: "If the undisputed evidence does not establish, as we believe it does, the fact that [the payment was authorized], it conclusively proves at least that [Gibbs Brothers & Company] . . . acted under the honest and justifiable, if mistaken, belief that [the payment was authorized]." *Jones,* 130 S.W.2d at 271. Put

24

another way, "if the payment [was authorized], there was compliance . . . with the provisions of the deed for extension of the time for removal," but if the payment was not authorized, "there was no such compliance and the time was not extended, *unless by reason of the peculiar facts and special circumstances equity [could] grant relief from a literal enforcement of the conditions prescribed by the deed.*" *Id.* (emphasis added). Having so framed the question, the court proceeded to a lengthy discussion in which it based its reasoning on the three-factor test of *F. B. Fountain Co.* and held that Gibbs Brothers & Company's failure to comply with the strict terms of the lease would be excused by "overruling equitable rules." *Id.* at 273. In our estimation, the *Jones* court clearly intended to reach the issue of equitable intervention, and to base its disposition on that ground. In so doing, it adopted the three-factor *F. B. Fountain Co.* test for cases of mere neglect.

We are not alone in this view. The Texas Supreme Court has twice referred to *Jones*'s discussion of equitable intervention as law, and we are aware of no case in which the court characterized that discussion as dicta or otherwise called into question the vitality of the *Jones* rule. *Sirtex Oil Indus., Inc. v. Erigan*, 403 S.W.2d 784, 788 (Tex. 1966) (considering when "equity should afford relief" and quoting *Jones*'s statement of the three-factor test for cases of negligence); *Zeidman v. Davis*, 342 S.W.2d 555, 558 (Tex. 1961) (discussing "the equitable rule approved by th[e] court in *Jones*"). VEF urges us to ignore these cases because neither rested its holding on an application of Jones. *See Reynolds-Penland Co.*, 567 S.W.2d at 241 ("*Sirtex* [was] . . . not authority" for the applicability of equitable intervention in cases of mere neglect because "that discussion was not essential to the decision."). This argument misses the point. These cases may not rest on the rule announced in *Jones*, but they assume that rule is part of Texas common law. *E.g., Zeidman*, 342 S.W.2d at 557; *see also Reynolds-Penland Co.*, 567 S.W.2d at 242 (Guittard, C.J., dissenting) (The rule

of intervention in cases of mere neglect "has been adopted by the Supreme Court of Texas in . . . *Sirtex*.").

Many Texas intermediate courts have done the same. *E.g., Besteman v. Pitcock*, 272 S.W.3d 777, 790 (Tex. App.—Texarkana 2008, no pet.) (*Jones* is the "touchstone case" for equitable intervention); *Moosavideen v. Garrett*, ___ S.W.3d ___, 2008 WL 4965165, at *15–16 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (citing as binding authority *Jones*'s test for equitable intervention); *Abraham Inv. Co. v. Payne Ranch, Inc.*, 968 S.W.2d 518, 527 (Tex. App.—Amarillo 1998, pet. denied) ("In the *Jones* case, the court explicated the general rule regarding equitable relief[.]"); *Buffalo Pipeline Co. v. Bell*, 694 S.W.2d 592, 598–99 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.) ("The equitable considerations set forth in [*Jones*] are similar to those in this case and these 'overruling equitable rules' prevent the limitation of appellant's lease." (citation omitted)). And some have expressly rejected the reasoning of *Reynolds-Penland*. For example, in *Crown Consturction Co. v. Huddleston*, the court noted that *Reynolds-Penland* "held the language in *Jones* to be dicta and refused to apply the doctrine in situations in which a lessee simply neglected to exercise its renewal option on time." 961 S.W.2d 552, 558 (Tex. App.—San Antonio 1997, no pet.). The *Crown Construction Co.* court disagreed; it concluded that "[t]he doctrine of unconscionable, inequitable, or disproportionate forfeiture was established in [*Jones*]." *Id.* at 558; *see also, e.g., Inn of the Hills, Ltd. v. Schulgen & Kaiser*, 723 S.W.2d 299, 301 (Tex. App.—San Antonio 1987, writ ref'd n.r.e.). ("We adopt the view of Chief Justice Guittard, expressed in his dissenting opinion in *Reynolds-Penland*[.]").

Our review of these cases bolsters our conclusion that the *Jones* court adopted the three-factor test for equitable intervention in cases of mere neglect. We proceed to apply that test to the facts of this case.

## 2. ElderCare's failure to comply with the strict renewal terms was properly excused by equitable intervention.

On the basis of the Bankruptcy Court's factual findings, we agree with its conclusion that ElderCare's failure to provide notice was mere neglect that should be excused under Texas's narrow equitable exception to the rule of strict enforcement. First, ElderCare's delay in exercising its option was relatively slight. It provided written notice approximately one month late, one day after it was informed of its negligent omission. We consider this a relatively minor delay when compared to the lease's original ten-year term and its five-year renewal term. Arguing to the contrary, VEF relies on a single case, *Scott-Burr Stores Corp. v. Wilcox*, 194 F.2d 989, 991 (5th Cir. 1952), in which we sustained a judgment against a lessee that delivered its renewal notice ten hours late. That reliance is misplaced. *Scott-Burr Stores Corp.* concerned the question whether the notice of renewal was in fact late. The court noted "the argument . . . that [its] judgment [was] harsh and inequitable" *Id.* at 991. However, there was "no basis for determination by [the court] of the respective equities of the parties" because "no grounds for equitable relief from the lapse were urged in the trial Court." *Id.* at 991. To the contrary, here all recognize that the notice was late, and we are called upon to assess that tardiness in light of "the respective equities of the parties." *Scott-Burr Stores Corp.* offers no instruction on this question.

Second, VEF "failed to demonstrate that it [would] be harmed by allowing equity to intervene in this case [to] extend the lease." Renewal Order, p. 3. On appeal, it has advanced only general arguments about the sanctity of property rights, e.g., reliance on "the most basic elements of property law that repeatedly affirm the importance of property rights." At best, these contentions establish only abstract, *de minimis* harm.

We find most compelling the third and final factor: "[N]ot to grant

[ElderCare] relief would result in such hardship . . . as to make it unconscionable to enforce literally the condition precedent of the lease." *Jones*, 130 S.W.2d at 641 (internal quotation omitted). As the Bankruptcy Court stressed, the lease is "the only basis" upon which ElderCare "can continue as a viable business." Renewal Order, p. 3. For this reason, ElderCare "invested over $300,000 in fees and costs alone in proving that VEF did not terminate the Lease pre-petition." *Id.*; *see* Part II(A), *supra*. It did so "for the sole purpose of . . . reorganizing the business[,] which necessarily depended on the option being exercised and the Lease extended." Renewal Order, p.3. In short, "[t]he entire chapter 11 case and the litigation . . . involved and required preservation of the Lease option period." *Id.*

The Bankruptcy Court's October 18 order allowing ElderCare to take on the lease in bankruptcy at least implicitly assumed the lease would be renewed. That order was issued in furtherance of ElderCare's plan of reorganization, which contemplated the lease of Valley Grand Manor as ElderCare's only significant ongoing asset. And it was issued two and one half months before the lease's initial ten-year term was set to terminate. Surely, when on November 16 the court ordered the parties to mediate new insurance coverage limits (two weeks before the renewal notice was due), it had in mind more than the remaining six weeks of the lease's primary term.

Subsequent events suggest that the parties so understood the order. It took ElderCare more than two months to secure VEF's cooperation in carrying out the mediation, from early October to mid-December. Only ElderCare's resort to the Bankruptcy Court for an order compelling the mediation proved effective in gaining VEF's "voluntary" agreement to the terms of the mediation. *Cf.* Assumption Order, pp. 7–8, ¶45, ¶50 ("In response to [ElderCare's] multiple requests to negotiate the rent amount, the VEF Board" demanded that new provisions "be included in a new Lease or amendment before it would negotiate

the rent amount."). That agreement was given in the middle of December, only one day before the hearing on ElderCare's motion to compel was to occur and 17 days after the deadline for ElderCare's renewal notice had passed. And the agreement scheduled the parties' mediation for February, more than a month after the renewal period was set to commence. But mediation of the coverage limits would have been an exercise of absurdity if ElderCare was to be held to the renewal deadline, which, again, had already passed when the parties agreed to schedule the mediation. Less than two weeks after that agreement was reached, two days after the renewal term was to commence and more than a month before the mediation was to occur, VEF notified ElderCare of its failure to comply with the renewal notice requirement.

As did the Bankruptcy Court, "[a]t best [we] assum[e] that VEF asserted its termination argument only after it realized there was no written notice sent to it." Renewal Order, p. 3. Until that realization, VEF "behav[ed] in every aspect as if it knew that [ElderCare] intended to exercise the extension." *Id*. That VEF's realization occurred so late in the game, while the parties were in frequent contact negotiating the ongoing terms of the lease, lends much credence to the idea that ElderCare's omission is best understood in light of the unique circumstances leading up to, and following, the renewal date. *See, e.g., Buffalo Pipeline Co.*, 694 S.W.2d at 599 (granting equitable intervention and stressing that after the purported failure effectively to renew, the lessor sent the lessee a letter in which it "did not state that the lease had been terminated" and that in ongoing communications the lessor "did not notify [the lessee]" of the technical defect in the renewal).

Conscious of these circumstances, we cannot ascribe ElderCare's omission to simple "forgetfulness." Nor do we understand ElderCare to argue that VEF was under some obligation to alert ElderCare about the Option and the need to exercise it. Rather, ElderCare suggests, and we agree, that VEF's failure to

raise the issue of renewal during the parties' ongoing, extensive discussions is a factor in the analysis of unconscionability. *Cf.* Renewal Order, p. 3 ("At worst, VEF laid behind the log in this case, continuing to negotiate with the Debtor regarding Lease terms and appearing in Court, all the while not pointing out that the Lease was terminated under its theory."); Assumption Order, p. 19, ¶132 ("VEF did not respond to [ElderCare's provision of information pertaining to its insurance coverage], but allowed ElderCare to continue to believe that VEF was working with them on the insurance issue which is what ElderCare continued to believe."). Relatedly, the parties were not engaged in "ongoing negotiations" as to the extension of the lease, as VEF argues, but negotiations as to the terms of a court-ordered mediation in the context of a Chapter 11 reorganization that rested on the perpetuation of the lease. VEF's reliance on *Hillhaven, Inc. v. Care One, Inc.*, 620 S.W.2d 788 (Tex. Civ. App.—Fort Worth 1981, writ ref'd n.r.e.), is thus misplaced. *See id.* at 793 ("[The lessor] did nothing more than express interest in the receipt of the payment to which it was entitled[.]"). Lastly, we find too clever by half VEF's argument that ElderCare would suffer no harm upon termination of the lease because "[ElderCare's] unexercised option [was] not a present right in the property." That argument proves too much; it would apply in every case. And it is no answer to the years of litigation and more than $300,000 in costs and fees that ElderCare has undertaken in order to reorganize as an ongoing business.

We conclude it would be unconscionable to deprive ElderCare of the extended term of the lease. And in the absence of countervailing considerations, we hold that in this extraordinary case Texas law sanctions the intervention of equity to excuse ElderCare's failure to provide timely notice. Because we reverse the judgment of the District Court on this basis, adopting the Bankruptcy Court's disposition of the dispute, we need not reach the Bankruptcy Court's alternative holdings that the renewal notice requirement was incapable of being

performed or that its judgment could be sustained on the basis of its broad authority under the Bankruptcy Code.

## III. CONCLUSION

For the foregoing reasons, the District Court's September 27, 2007 order affirming the Bankruptcy Court's assumption order is AFFIRMED. The District Court's February 25, 2008, judgment reversing the Bankruptcy Court's order that denied VEF's motion to compel ElderCare to vacate the premises is REVERSED.