In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-10-00081-CV

                                                ______________________________

 

 

                                     MILTON E. AUNAN,
II, Appellant

 

                                                                V.

 

            VHA SOUTHWEST COMMUNITY HEALTH CORPORATION,

D/B/A COMMUNITY HEALTH
CORPORATION, Appellee

 

 

                                                                                                  


 

 

                                      On Appeal from the 102nd
Judicial District Court

                                                             Bowie County, Texas

                                                      Trial Court No. 09C0385-102

 

                                                                                                   

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                        Memorandum Opinion by Chief Justice Morriss








                                                      MEMORANDUM OPINION

 

            Milton E. Aunan, II, was
executive vice president and chief financial officer of Wadley Health System
and Wadley Regional Medical Center (collectively, Wadley), until his
resignation, which became effective December 31, 2008.  The end of Aunan’s employment came between at
least two potential sales of Wadley—the former potential sale falling through
and the latter closing.  This case
concerns Aunan’s claim for severance benefits under the Letter of Agreement
(Contract) governing his employment.

            Aunan
initiated this case claiming breach of the Contract by VHA Southwest Community
Health Corporation, d/b/a Community Health Corporation (CHC), the successor
employer to Wadley by way of a transfer of the Contract.  Aunan claimed he was entitled to the contractually
specified severance package on the termination of his employment.  Faced with competing motions for summary
judgment, the trial court granted CHC’s motion, denied Aunan’s second partial
motion for summary judgment,[1]
and rendered judgment that Aunan take nothing. 
We reverse the trial court’s judgment and remand this case for further
proceedings consistent with this opinion.

            Aunan was originally hired by
Wadley.  The Contract provided, in
pertinent part:

 

2.         The
President/Chief Executive Officer may, at his discretion, terminate your
employment at any time, and for any reason, by giving written notice to
you.  Upon such termination, all rights,
duties and obligations of both parties shall cease, except that the Medical
Center shall continue to pay you your then monthly salary for a period of
twelve (12) months (including the month in which termination occurred) as an
agreed upon severance. . . . Also, during this period, the Medical Center
agrees, at its expense, to keep your group life and group health insurance
fully in effect and to provide you with out-placement services . . . .

 

3.         The severance arrangements described in
Paragraph 2 shall be available if Wadley Health System and/or Wadley Regional
Medical Center shall sell, merge, joint venture or lease all of or a material
part of its assets or business, directly or indirectly, and as a result you are
terminated.

 

4.         You may also terminate your employment
at any time, for any reason, by giving at least 30 days’ advance written notice
to the President/Chief Executive Officer, but if you do, all rights, duties and
obligations of both parties will cease and you will not be entitled to any
severance benefits, unless said termination is pursuant to Paragraph 8 herein.  . . . .

 

            . . . .

 

8.         If Wadley Health System and/or Wadley
Regional Medical Center shall sell, merge, joint venture or lease all of or a
material part of its assets or business, directly or indirectly, or closes, you
may terminate your employment at your discretion or be retained as Executive
Vice President/CFO of any successor corporation to or holding company of the
Wadley Health System.  If you elect to
terminate your employment at such time, you shall be entitled to the same
severance arrangement as is applicable under Paragraph 2 when the
President/Chief Executive officer terminates your employment.  Any election to terminate your employment
under this Paragraph must be made prior to the finalization and/or closing of
the transaction whether it be, a joint venture, merger, sale or closure.

 

Shortly after it was signed, the Contract was assigned to
CHC.  

 

            Several
years into Aunan’s employment, financial stresses contributed to a perceived
need to sell the hospital.  That
environment ultimately developed into this dispute.

            November 6,
2008, is a date important to this case. 
As of that date, efforts to sell Wadley were about four months
old.  Both Christus St. Michael Health System (Christus) and Brim
Healthcare, Inc. (Brim), had been suitors to purchase the hospital.  On November
6, Christus and Wadley had a pending, unbinding letter of intent providing the
expectation that Wadley assets would be sold to Christus.  Aunan had
received a copy of a “Q&A” document stating Christus and Wadley “announced
on Wednesday, Oct. 22, 2008, that they have agreed to enter into a non-binding
Letter of Intent (LOI) wherein CHRISTUS would acquire Wadley and consolidate
the two community health providers into a single system.”  The document “indicated that only an
Administrator and Chief Nursing Officer would make up the Administrative Team
at Wadley.”  On November 5, Aunan “attended
a Wadley board of directors meeting whereby the imminent sale of Wadley . . . was
discussed in detail.”  By his letter
dated November 6, Aunan gave notice under the Contract of his election to
resign.  In the letter, he referenced Wadley’s prospective sale of assets
to Christus and added information suggesting that Wadley was in a financial
condition at the time that made it likely that Wadley could continue operations
for no more than sixty days under the conditions existing at the time. 
Aunan’s letter set December 4, 2008, as his last day of employment.  If
all had continued as expected, the situation would have been relatively
straightforward.  But things changed, dramatically.

            With his last
day of employment approaching, Aunan found a new position with a hospital in
Iowa.  But Wadley believed it needed
Aunan’s continued presence.  That
prompted chairman of the board of directors, Fred Norton, to send an e-mail to other
Wadley executives.

I
think this is an “over-reaction” by [Aunan]. 
We need and want him to stay
to see us through this.  I think the
intent of the provision he cites is to give him a severance if he does not
become employed by the successor entity (by his choice or by the entity’s
choice).  He only needs to communicate
that choice “prior” to closing.  He has
now done that.  He does not need to
separate from service prior to closing—although he seemingly has the right to
do so.  I hope he will choose to remain
on the payroll until the transaction closes, and then he collects his severance
afterward.

 

Wadley approached Aunan and convinced him to remain on board
temporarily; the following e-mail was exchanged among Wadley executives:

As
you can see [Aunan] is exercising his rights under his employment contract to
protect his severance.  He and I have
spoken about this, and he is not looking to leave Wadley, nor is there anything
magic about his December 4th date.  This
is merely the 30 day notice required under his contract.  This letter was triggered by the attached “20
questions” distributed publicly recently which talked of keeping an
administrator and a CNO, no mention of a CFO. 
Therefore, it appears, that he has been “noticed.”  I will say, that I would like -- and Wadley
needs -- now, more than ever, [Aunan]’s presence here at least through the
closing.  Can we set up a contractual
arrangement to keep him here while protecting his rights?

 

            On November
19, 2008, Christus withdrew from the existing letter of intent.  The
letter of intent “was officially withdrawn by another proposed letter of
intent, dated November 25, 2008,” which the Wadley board of directors rejected
December 3, 2008.  Aunan was aware of the
board’s decision.  Wadley began to search
for other potential buyers.

            Meanwhile,
Aunan obtained an extension with his new employer to start January 5 “so he
could remain at Wadley to see [it] through the transaction.”  By his letter of December 19, 2008,
Aunan—still employed under the Contract—referenced his November 6 letter and
extended his last day of employment to December 31, 2008.  

            On December
23, 2008, Wadley and Brim picked up discussions about the possibility of Brim
being the purchaser.

            After
working through December 31, Aunan left Wadley for his first active date of his
new employment in Iowa, commencing January 5, 2009.  

            Wadley’s
discussions with Brim ultimately resulted in a preliminary sale agreement dated
January 14, 2009, the same day Wadley filed bankruptcy.  In a subsequent
auction held in the bankruptcy proceeding, Brim outbid Christus and became the
purchaser at a sale, which was closed March 1, 2009.

            When Aunan
did not receive the severance package described in paragraph two of the
Contract, he sued CHC for breach.  During
discovery, Aunan obtained the following testimony from Michael Lieb, Chief
Executive Officer of Wadley:  “Q.  Do you see any requirement in Mr. Aunan’s
Employment Contract as depicted in Deposition Exhibit No. 2 that requires Mr. Aunan
to stick around until the transaction closes? 
A.  I do not.”  Aunan filed a motion for partial summary
judgment citing Lieb’s testimony and Norton’s e-mail in which he wrote Aunan
did “not need to separate from service prior to closing -- although he seemingly
has the right to do so.”  

            CHC also
filed a motion for summary judgment.  Attached
was the affidavit of James A. Summersett, III, former Chief Executive Officer
of Wadley, stating:

The
purpose for including [paragraph eight] . . . was to provide the executive with
a financial incentive to remain employed with WHS while a change-of-control
transaction is being negotiated and finalized. 
WHS was concerned that once executives at WHS found out that the
hospital might be sold, they would seek out and accept other employment while
the negotiations were still ongoing, which could severely hinder negotiations
and the closing of the transaction.

 

CHC argued that paragraph eight’s
language “[i]f you elect to terminate your employment at such time” meant such time
as “Wadley Health System and/or Wadley Regional Medical Center shall sell,
merge, joint venture or lease all of or a material part of its assets or
business.”  Although the election to
terminate employment must have been made “prior to the finalization and/or
closing of the transaction,” CHC argues that the transaction between Wadley and
Christus never closed and that, because Aunan had left prior to the asset
purchase agreement and the closing of the Brim transaction, his letter notices
could not be seen as a notice under paragraph eight with regard to the Brim
transaction.  In sum, CHC argued that
Aunan’s notices constituted a paragraph-four notice of termination of
employment and that, therefore, Aunan was not entitled to any severance
benefits.  

            Aunan
responded by claiming that he had met the requirements of paragraph eight,
(1) that he give notice “prior to the finalization and/or closing of the
transaction” and (2) that there be some closing of a transaction.  He also argued that the phrase “at such time”
was ambiguous.

            After
reviewing the summary judgment evidence, the trial court ruled in favor of
CHC.  We now review the trial court’s
summary judgment. 

            We employ a
de novo review of the trial court’s grant of a summary judgment, which is based
on written pleadings and written evidence rather than live testimony.  Valence Operating Co. v. Dorsett, 164
S.W.3d 656, 661 (Tex. 2005); see Tex. R. Civ. P. 166a(c). 
Summary judgment was proper if CHC established there were no genuine
issues of material fact such that it was entitled to judgment as a matter of
law.  Nixon v. Mr. Prop. Mgmt., 690 S.W.2d 546, 548 (Tex. 1985); French
v. Gill, 252 S.W.3d 748, 751 (Tex.
App.—Texarkana 2008, pet. denied); see Tex. R. Civ. P. 166a(c). 
During our analysis of the traditional motion, and in deciding whether
there is a disputed material fact issue which precludes summary judgment, we
take evidence favorable to Aunan as true and resolve all doubts in his
favor.  Limestone Prods. Distrib.,
Inc. v. McNamara, 71 S.W.3d 308, 311 (Tex. 2002); Rhone-Poulenc, Inc. v.
Steel, 997 S.W.2d 217, 223 (Tex. 1999); Nixon, 690 S.W.2d at 548.  When
both sides move for summary judgment, the court is to review both sides’
summary judgment evidence, determine all questions presented, and render the
judgment the trial court should have rendered. 
See FM Props. Operating Co.
v. City of Austin, 22 S.W.3d 868, 872 (Tex. 2000).

            In
addressing whether summary judgment was appropriate, we must decide first
whether the Contract is ambiguous.  We
look to the Contract as a whole and give effect to each provision when
determining whether paragraph eight is ambiguous.  Besteman
v. Pitcock, 272 S.W.3d 777, 785 (Tex. App.—Texarkana 2008, no pet.) (citing
Coker v. Coker, 650 S.W.2d 391, 394
(Tex. 1983)).  If the court could
properly give paragraph eight a definite or certain legal meaning or
interpretation, then it was not ambiguous. 
Chrysler Ins. Co. v. Greenspoint
Dodge of Houston, Inc., 297 S.W.3d 248 (Tex. 2009).  Just because the parties advance conflicting
interpretations of the Contract, that does not make it ambiguous.  Hicks
v. Castille, 313 S.W.3d 874, 880 (Tex. App.—Amarillo 2010, pet.
filed).  An ambiguity exists if the
contract language is susceptible to two or more reasonable interpretations
after applying the applicable rules of construction.  In re
D. Wilson Constr. Co., 196 S.W.3d 774 (Tex. 2006); Enter. Leasing Co. of Houston v. Barrios, 156 S.W.3d 547 (Tex.
2004).

            “The primary
concern of a court in construing a written contract is to ascertain the true
intent of the parties as expressed in the instrument.”  Kelley-Coppedge,
Inc. v. Highlands Ins. Co., 980
S.W.2d 462, 464 (Tex. 1998).  “We construe
contracts ‘from a utilitarian standpoint bearing in mind the particular
business activity sought to be served’ and ‘will avoid when possible and proper
a construction which is unreasonable, inequitable, and oppressive.’”  Frost
Nat’l Bank v. L & F Distribs., Ltd., 165 S.W.3d 310, 312 (Tex.
2005) (quoting Reilly v. Rangers Mgmt., Inc., 727 S.W.2d 527 (Tex.
1987)); see Old Republic Sur. Co. v. Palmer, 5 S.W.3d 357, 360 (Tex.
App.—Texarkana 1999, no pet.); Nat’l Convenience Stores, Inc. v. Martinez,
784 S.W.2d 468, 471 (Tex. App.—Texarkana 1989, writ denied) (“a reasonable
interpretation of an agreement will always be preferred to one which is
unreasonable”).

            Looking at
the Contract as a whole, one can see that it sought to accomplish the business
activity of obtaining Aunan’s full time, professional services as Executive
Vice President and CFO of Wadley, to bind him to confidentiality, to bind him
for one year after his termination not to compete with Wadley in its market
area or solicit its employees away, and to bind him from interfering with
Wadley employees and from diverting any business from Wadley.  In exchange, not only was Aunan to be paid
during his employment, but also he was to receive twelve months’ severance
payments if he was terminated or if he resigned under certain
circumstances.  The severance payments
were part of the package intended to persuade Aunan to agree to the terms of
Wadley’s employment initially.  According
to Summersett’s summary-judgment affidavit, the severance provisions were, in
part, intended to encourage Aunan to continue his services, without undue worry
about his financial future, even when his employer encountered serious business
stresses and was trying to find a buyer.

            Turning to
the language central to this dispute, the first three sentences of paragraph
eight control how Aunan could qualify for severance benefits.  The first
sentence provides that, if Wadley sells, merges, or stops doing business, Aunan
had two contractually provided options, either to resign his position or to
continue his employment as CFO of any successor corporation or holding company
in the Wadley system.  The second sentence provides that, if Aunan elected
to resign “at such time,” he could entitle himself to severance benefits, as if
he had been terminated.  The third sentence provides, “Any election to
terminate [Aunan’s] employment under this Paragraph must be made prior to the
finalization and/or closing of the transaction . . . .”

            Paragraph
eight was triggered, because the Wadley assets were sold to Brim in a closing
conducted March 1, 2009—the end of an eight-month effort to find a buyer for
the financially stressed hospital operation.  Therefore, Aunan could have
been able to terminate his employment and to qualify for severance benefits, if
he followed the terms of the Contract.  This case turns on what the Contract
means when it describes Aunan’s qualifying action as electing to terminate his
employment “at such time” and whether the summary-judgment facts disqualify him
from severance benefits as a matter of law.

            Aunan
argues that the phrase “at such time” means any time before the closing of a
transaction, i.e., that the Contract required only that a sale or other
transaction had to occur and that he had to make his election before the
finalization or closing of the transaction.  Because, on November 6, 2008,
Aunan notified Wadley of his decision to terminate employment, and a sale to
Brim closed March 1, 2009, Aunan believes he is entitled to severance benefits
as a matter of law.  If those were indeed
the only requirements, however, then any employee who wanted to assure himself
or herself of severance benefits in the event of any future sale, no matter how
remote, could give a resignation notice at any time during his or her term of
employment and thus be entitled to severance benefits if any sale were to occur
in the future.  That interpretation seems
dubious.

            On the other
hand, CHC claims that the phrase “if you elect to terminate your employment at
such time” means that Aunan’s employment must have terminated at the time of
the sale.  From CHC’s argument—in which it points out that Aunan’s last
day of employment with Wadley, that is, December 31, 2008, “occurred more than
two months prior to the sale of the assets”—CHC effectively argues that Aunan’s
last day of employment must have been precisely the date of the closing of the
sale of assets and that, otherwise, the Contract was not satisfied.  That interpretation seems to craft an equally
dubious, narrow window, without concomitantly precise or explicit Contract
language.

            CHC also argues
that an employee’s notice to terminate employment must connect with a
particular transaction.  It claims that,
because Aunan’s notice was received in connection with the Christus transaction
and because the transaction between Wadley and Christus never closed, Aunan is
not entitled to severance benefits.  That
is true, they claim, because (1) Aunan did not send notice of termination of
employment with respect to the Brim transaction, and (2) he left employment
before Brim and Wadley agreed to the preliminary asset purchase agreement.  We find that the express language of paragraph
eight does not establish CHC’s position as a matter of law.

            Instead, we
see ambiguities in the relatively imprecise Contract language.  CHC could be correct in its assertion that
the Contract requires the effective date of Aunan’s termination to be precisely
the date the sale is closed, if the phrase “at such time” is read to link
termination to the time of the sale, and if the time of the sale is understood
to be the date the parties became contractually bound to sell or the date the
sale is closed.  But, without more
explicit or precise contract language requiring Aunan’s last day to coincide
with closing the sale, we believe there are other reasonable interpretations.

            While
Aunan had to make his election before the closing of the sale to Brim, it is
possible the Contract might be reasonably understood as linking the election
generally to the season of the sale, for example, to the time a sale or
cessation of business became contemplated. 
Here, it seems at least possible that some sale or transfer of hospital
assets, or the cessation of business, was within the contemplation of Wadley
and its executive employees, including Aunan, when he gave notice of his
election to terminate his employment, given that Aunan’s affidavit states he
attended a board meeting in which a sale to some entity was imminent to prevent
cessation of operation within sixty days.  If proven, would that be
sufficient to qualify him for severance benefits?

            Because
of the peculiar structure of this agreement—if Wadley sells or closes, Aunan
may resign “at such time” and qualify for severance benefits, but he must make
his election before the sale closes or operations cease—the parties necessarily
assumed that, at the time of Aunan’s election, there would be some degree of
anticipation of, or some degree of connection with, a sale or closure that
ultimately occurs.[2]  Otherwise, it would be impossible for Aunan
to make any election before a closing or closure.  The Contract is silent on what type of
anticipation or connection Wadley and Aunan contemplated with this Contract,
whether it be, for example, (1) Aunan’s simple awareness of some sort of
impending sale or closure that ultimately occurs, (2) an identification,
with or without a letter of intent, of a particular potential buyer who
ultimately buys, or (3) a binding contract to sell to a particular buyer who
ultimately buys. 

            This
Contract was drafted by Wadley and was a letter agreement, which could have
been considerably more formal or more explicit.  While one might
reasonably interpret this Contract to require that a particular sale to a
particular buyer be contemplated at the time of Aunan’s election to terminate
and that the contemplated sale be ultimately closed, the Contract does not
expressly say that.  We are uncertain about what was intended.  We, therefore, conclude that a contract
ambiguity exists regarding the Contract’s required degree of anticipation of,
and/or required degree of connection with, a sale or closure that ultimately
occurs.  One or more fact issues also may
exist concerning whether such required anticipation and/or connection existed
when Aunan made his election to resign.

            Therefore, we
reverse the summary judgment and remand this matter to the trial court for
further proceedings consistent with this opinion.

 

 

                                                                                    Josh
R. Morriss, III

                                                                                    Chief
Justice

 

Date Submitted:          October
18, 2010        

Date Decided:             December
16, 2010

 

 

 











[1]The
trial court previously denied Aunan’s first motion for summary judgment.  That action is not the subject of this
appeal.  





[2]Our
conclusion that the parties intended some anticipation of, or some connection
with, a sale or closure does not even consider the paragraph-four requirement
that Aunan give a thirty-day notice of termination.  The parties seem to have assumed that a
thirty-day advance notice was required, even in a paragraph-eight termination,
but that is not among the issues discussed on appeal.








tyle:
italic'>

            The
State also argues that evidence of Wirth’s intent to deceive is shown by the
testimony of James Bloodgood, a vice-president of Amegy Bank, regarding a
business transaction with Wirth that is unrelated to this prosecution.  Wirth complained this evidence was
inadmissible, citing Rule 404 of the Texas Rules of Evidence.  See Tex.
R. Evid. 404.  In our previous opinion,
we ruled this evidence to have been admissible; since no appeal was taken
regarding that issue, it is a final ruling.

            Reiterating
that evidence, the record shows that Bloodgood testified to a sequence of
overdrafts in two of Wirth’s accounts with that bank and opined that he,
likewise, suspected Wirth of kiting. 
Bloodgood testified that he ultimately asked Wirth to liquidate
securities that were partially used as collateral on a $50,000.00 line of
credit toward the end that the overage (about $36,000.00) could be applied
toward the uncollected portion of Wirth’s accounts.  Bloodgood stated that he had released the
securities for that purpose.  (Wirth
maintained several accounts there:  one
for another of his companies, Certified Vehicle Leasing, and another for Wirth
Leasing, as well as personal accounts.) 
There is evidence that a form used by Bloodgood for the release of the
security interest which was signed by him February 10, 2005, was altered after
it was in Wirth’s possession.  After the
securities were sold, the funds thus realized were not applied to the debt at
Amegy Bank, but were, instead, transmitted to Wirth’s personal account and then
deducted by him from that account via a series of cashier’s checks from a
different branch.  This occurred during
the three-month time frame during which the drafts involved with this
prosecution were issued.  Bloodgood
testified that his bank was ultimately unable to collect on the line of credit
and lost an additional $41,000.00 as a result of the uncollected fund
transfers.  Evidence showed that Wirth
misled Bloodgood into thinking he would liquidate his securities to pay the
loan to Amegy Bank.  Then, according to
Bloodgood, Wirth managed to sell the previously secured stocks and have the
proceeds from their sale transferred to his own account without satisfying the
bank loan which had been secured by them. 
Logically, if this evidence is relevant on the issue of intent, it is
some evidence from which a jury could infer that Wirth did not intend to honor
the drafts at the time they were issued or that he knew they would not be
honored.  

            Reviewing
the evidence for legal sufficiency pursuant to the plurality opinion in Brooks,
we defer to the responsibility of the jury to resolve conflicts, weigh evidence,
and draw reasonable inferences, but we are also aware that we must review the
evidence rigorously in order to fulfill our duty as a reviewing court, which
(by necessity) includes a focus on the quality of the evidence presented.  Brooks, 323 S.W.3d at 917.  

            As
we have previously outlined, the evidence that we found that constituted “some
evidence” sufficient under Clewis
to allow the
jury to infer the issue of intent was the testimony concerning the other bank
transaction.  However, under the rigorous
review now required under the proper sufficiency analysis, the existence of any
evidence is not determinative of whether the evidence is sufficient to allow a
rational jury to find Wirth guilty beyond a reasonable doubt.  When we look at that transaction, we find
that it is substantially dissimilar to the allegations of deception lodged
against Wirth by this indictment.  In the
Bloodgood testimony, it is suggested that Wirth manipulated Bloodgood and his
bank into signing a form that later was altered.  Since the document was in Wirth’s possession,
and since the document’s alteration allowed him to receive the funds without
paying the bank loan, the implication is that he either altered it himself or
caused it to be altered.  If this
allegation is true, Wirth deliberately took affirmative actions which resulted
in his improperly receiving the funds. 
That misconduct, however, is no part of the charges for which Wirth was
on trial. 

            Wirth’s
dealings with the banks and automobile dealerships in connection with the
drafts are not analogous to his dealings with Amegy Bank.  As previously noted, drafts issued to the
automobile dealerships were integral to the same procedures previously followed
many times in the regular course of a business that Wirth had successfully
conducted for many years.  No
irregularity (such as the alteration of commercial instruments) was shown in
any of the transactions which are the heart of the State’s case against Wirth.  The drafts were signed by Rogers, who had
handled these transactions for years; the lease contracts were approved by the
funding banks; the money was sent to the leasing bank account; and, except for
the fifteen drafts executed just before the business collapsed in a heap,
drafts issued in the same manner had been honored by Wirth’s business for a
period of years.  For 2004, the company
was issuing and honoring at least thirty to forty such drafts every month.  While there is no explanation as to why the
funds to pay for the drafts dissipated over a period of time, we have not been
directed to any evidence of Wirth personally raiding the bank account to any
greater extent than he had done before, when the business was successful.  We have previously concluded that the
evidence of the Bloodgood incident was admissible, albeit with some
misgivings.  However, there is a complete
absence of any evidence from which an inference could be drawn that might show
that the Amegy Bank incident involving Bloodgood had a place in some grand plan
or scheme to steal or defraud.  In the absence
of some perceptible and reasonable linkage with such, we find its probative
value to support a reasonable inference that Wirth had the necessary intent not
to honor the drafts to be weak and insubstantial. 

                        2.         The Rogers Insurance Policy 

            Wirth
also complained of the admission of testimony from Rogers about Wirth’s
liquidation of what Rogers testified was an insurance policy that represented
his retirement account.  We recount that
testimony (much in the same form as our original opinion issued in this case)
to aid in understanding the issue of sufficiency.  Rogers testified that Wirth had purchased a
life insurance policy designed to compensate Wirth if Rogers died while
employed, with half the benefits to Wirth and half to Rogers’ wife.  However, if Rogers retired, he was then to
receive the cash value of the policy as his retirement benefit.  Rogers went on to state that Wirth cashed in
the life insurance policy and gave none of the proceeds to Rogers, this
occurring at about the same time of the Amegy Bank transaction.  As with the Bloodgood evidence about the
Amegy Bank transaction, the State also argued that this evidence showed Wirth’s
intent to deprive another of property which he formed or possessed at or about
the same time the fraudulent drafts were issued.  

            In
our previous opinion in this case, we ruled that Wirth’s actions concerning the
Rogers insurance policy was not sufficiently similar to the offense with which
Wirth was charged to have been relevant to the issue of Wirth’s mens rea
with regard to the crime with which he had been charged.  Therefore, it did not meet the measure of
being a similar transaction as contemplated pursuant to Section 31.03(c)(1) of
the Texas Penal Code and was, therefore, inadmissible as evidence.  Tex.
Penal Code Ann. § 31.03(c)(1) (Vernon Supp. 2010).  However, although we determined this evidence
to have been inadmissible, we also deemed it to have been harmless error. 

            F.         Closing the Account 

            Finally,
the State argues that Wirth’s closing of the account and withdrawing $41,000.00
also proves his intent to deceive.  But
the intent to deceive must have occurred at the time the drafts were written.  Does the fact that Wirth withdrew $41,000.00
evidence his intent that when Rogers issued drafts on approved contracts, Wirth
intended that these drafts would not be honored?  Although failing to pay those drafts was a
violation of his contract, it was also a diversion from his prior business
practices, which is perhaps revelatory of a character flaw and certainly
demonstrative of bad business practices; however, it does not evidence Wirth’s
intention to create and deliver drafts that he would then refuse to pay.  There simply is no evidence when these drafts
were issued by Rogers on approved contracts, that Wirth possessed the intention
at that time to dishonor them or that he knew they would not be honored when
they were issued. 

III.       Conclusion 

            We
have discussed each of the items of evidence that the State put forward to
support its position that Wirth deceived the automobile dealers by promising a
performance that he did not then intend to keep or that he then knew would not
be performed.  The only connection
between the extraneous alleged bad acts and the charged offenses is that Wirth
was involved in those acts, that appropriation of money was involved, and that
the alleged bad acts occurred at about the time that the wheels of the
apparently previously successful business fell off and Wirth began to scramble
for money from what he perceived as any available sources.  We are likewise mindful of the fact that the
statute states that we may not consider Wirth’s ultimate failure to repay
(standing alone) as evidence.  Indeed,
the State’s argument necessarily focused almost exclusively on the extraneous
bad acts to supply the requisite felonious intent because there is no evidence
associated with the drafts to support the State’s position.  Finally, there is the obvious fact that the
jury apparently could not agree (despite essentially identical evidence
existing for the issuance and dishonor of each draft) that Wirth engaged in
unlawful activities as to all of them. 
After reviewing all of this evidence in detail and studying the trial
record diligently, we find legally insufficient evidence to support the jury’s
conclusion that Wirth intentionally or knowingly issued the drafts without the
intent to honor them. 

            We
reverse the conviction and render a judgment of acquittal.

 

 

 

                                                                        Bailey
C. Moseley

                                                                        Justice

 

Date Submitted:          April 20,
2011

Date Decided:             April 21,
2011

 

Publish











[1]Tex. Const. art. V, § 6.





[2]The
indictment alleged that pursuant to one scheme and continuing course of
conduct, Wirth intentionally and knowingly unlawfully appropriated motor
vehicles of the aggregate value of $200,000.00 or more by bringing about a
transfer of title without the effective consent of Bonham Chrysler Plymouth
Dodge Jeep Eagle, Inc.; Toyota of Lewisville, Inc.; McKinney Dodge, Inc.; Lexus
of Clear Lake, Inc.; and Park Place Motorcars Dallas, the owners of the
property, and with the intent to deprive the owners of the property.  Tex.
Penal Code Ann. § 31.03(a) (Vernon Supp. 2010). 

 





[3]In
our first consideration of this case, Wirth also complained of certain
evidentiary rulings (discussed later) and as to venue in Fannin County (an
argument we previously rejected).





[4]Wirth’s
dealings with Amegy Bank and Rogers are discussed later.





[5]Kiting
is the process of drawing against balances credited to uncollected checks.